Decided at PENDLETON, 13 August, 1898.

## PAYNE v. HALLGARTH.

[54 Pac. 162]

DEEDS — DELIVERY.*— Having decided to convey his property to his brother's wife as the best provision for the brother's children, deceased executed a deed one month before his death, which he knew was impending, and handed it to his sister-in-law, with the remark that he deeded her the land, and wanted it to go to the children at his death. She then returned the deed to deceased, who placed it under his pillow, and later gave it to his brother, with directions to have it recorded after his death. *Held*, a sufficient delivery: *Fain* v. *Smith*, 14 Or. 82; *Flint* v. *Phipps*, 16 Or. 437, and *Hoffmire* v. *Martin*, 29 Or. 240, cited.

From Union : ROBERT EAKIN, Judge.

Suit by Mary E. Payne, Sarah Gunnell, Ann Thornton, Joseph Hallgarth, and William Hallgarth against Jane Hallgarth and others. From a decree for plaintiffs, defendants appeal.

REVERSED.

For appellants there was a brief and an oral argument by *Messrs. Thos. H. Crawford, J. F. Baker* and *Neil McLeod*.

For respondents there was a brief and an oral argument by *Mr. John L. Austin*.

MR. JUSTICE WOLVERTON delivered the opinion of the court.

The plaintiffs, Mary E. Payne, Sarah Gunnell, Ann Thornton, Joseph Hallgarth, and William Hallgarth, and the defendant Charles Hallgarth, are the brothers

---

*NOTE.—Scholarly monographic notes collating and classifying the authorities on What is a Delivery of a Deed are published in 53 Am. St. Rep. 587 and 12 L. R. A. 171. Another branch of the subject is ably annotated in 49 Am. St. Rep. 219 under the title Conveyance to Take Effect After Grantor's Death.—REPORTER.

and sisters and only heirs of Sibrit Hallgrath, who died intestate in Union County, Oregon, on November 21, 1893. On the twenty-first of October preceding his demise he executed and duly acknowledged a certain deed purporting to convey the premises in dispute to the defendant Jane Hallgath, and the only question involved in this suit is whether there was a delivery of such deed to the grantee to take effect presently, for it is not contended that it could have had effect otherwise. The evidence adduced at the trial is not voluminous, and we will state the substance of it.

Dr. Brownell, the family physician, testifies that on October 21, 1893, he was in attendance upon the deceased at his home, and there met Dr. Honan, of La-Grande, in consultation; that he was present when the deed was signed and witnessed, and heard the discussion preliminary thereto; that the deceased asked Dr. Honan what his chances were for getting well, and was told he would probably live a month or so, but it was thought he could not possibly get well, and that if he had any business matters to arrange he had better have them attended to right away. Witness, further testifying, says: "I told him I thought it would be better to fix matters up, and if he got well he could change it. * * * He told me that he didn't owe the people in the East anything; that he came west with but very little property, and earned all his money here in the West, and earned it by hard work, and that the property should go to Jane's children; that he loved the children, and he wanted them to have the property when he died. He seemed to be uneasy about the way to dispose of the property, so that it wouldn't tie Charlie up so that he couldn't do business, and asked what he had better do; how he had better do with it. I told him I guessed he had better deed it over to the children. Then he said he

couldn't do that very well, but would deed it over to Charlie. And then finally said 'No; he wouldn't trust Charlie, but would deed it over to Jane, and Jane could give it to the children then as they came of age.' * * * I proposed a will, and he said that if he made out a will that it would tie Charlie up so he couldn't do business, and wanted the matter fixed up so that Charlie could carry on all the business as he had done before. * * * We told Sib. that if he got well he could destroy the deed, and if he did not get well it should be given to Jane and taken care of.'' On cross-examination he says, in substance : The deed was to be recorded after Sib. died, and it was not to be recorded unless he did die as a result of the sickness for which he was being treated. He was to keep it, and if he died they were to record it, and if he did not die he was to do as he chose with it. He dictated what should be done. They proposed several ways, and he dictated his own way.

Jane Hallgarth testifies that she was living in the same house with deceased at the time of his death ; that his last sickness continued for a year or little over, but he was confined to his room only about the last month ; that she saw the deceased sign the deed, and that he handed it to her shortly thereafter ; that Marsh took the deed, and when it was returned, about a couple of hours afterwards, deceased handed it to her. She further testifies as follows : '' He wanted me to have his land. He said he deeded me his land because I had been good to him, and kind,— took care of him in his sickness. Q. Did he say anything about wanting it to go to your children? A. Yes, sir ; at his death. Q. What did you do with the deed then? A. I handed it back to him. Q. What did he do with it then? A. He put it under his pillow. * * * Saw the deed the next day. It had been put away in a trunk. He gave it to my husband to put

away for me.   Q. Why did you wait until after Sib.'s death before you sent it down to have it recorded?   A. Because I didn't want the land if he got well.   I wanted him to have his own property.   Q. Was that the arrangement, that if he got well he was to keep it?   A. Certainly, he was to keep it.   Q. And if he got well, and asked you for the deed, you would have given it back to him, would you not?   A. Yes, sir; I would have given it back.   Q. I will ask you if when you received that deed you took it with the understanding that it was to take effect only if Sib. Hallgarth died?   A. Yes.   Q. And if he got well he was to have it back again?   A. Yes, sir.''

C. H. Marsh testifies that one of Charles Hallgarth's boys came to Elgin, and asked him to go down and draw a will for Sib. Hallgarth; that he drew the deed at the request of Sib.; that when he came into the room Hallgarth spoke to him concerning the matter, whether it would be better to make a will or a deed, and explained to him what he wanted to do with his property, and witness told him he thought it would be better to make a deed.   Deceased said the matter had been talked over, and asked witness which he thought would be best, and was informed that the deed was preferable, and thereupon a description was procured, and witness drew the deed, and it was signed by deceased in the presence of witness and Dr. Brownell.   The substance of the understanding he got from Sib.'s conversation was '' that the deed was to be placed in the Farmers' & Traders' Bank, to be put on record if he should die, and, if not, to be returned to him.''   On being recalled, the following was elicited on cross-examination:   '' Q. I will ask you, if in your conversation with Sib. Hallgarth about what was the best instrument to carry out his purposes, if you

said to him that the deed could be made, and if made to be recorded after his death he could keep possession of the land until his death, and could control it by being able to recall the deed and destroy it, in case he got well. A. I did. That was his understanding, or, at least what his questions to me and answers to me indicated. Q. And the reason that you recommended it in that way? A. Yes, sir. Q. I will ask you if in that conversation he said to you that he wanted Jane and her children to have the property in case he died, but wanted to keep control of it if he got well. A. The children, so far as I remember, were not mentioned in there. He wanted the real estate to go to her. He might have mentioned for the benefit of the children, or something that way, but the real estate was to go to her. I don't remember that he said that he could recall or destroy the deed, or anything that way, or that he would keep possession; but, as near as I remember, his words were something similar to this: ' I want the property so if I don't die, or if I get well, that I can have it back again.' ''

Dr. M. F. Honan testifies '' that he was called in consultation with Dr. Brownell; that, after examining his patient, he told him he did not think he could get well, and that he could not live longer than about four weeks; that after dinner he saw Hallgarth privately, who told him he felt under no obligations to his other relatives ; that what he had Charlie Hallgarth, his brother, and he had made together, and that he wanted Charlie's children to get the benefit of it. A deed to Charlie, then a deed of trust to him, were discussed, but he finally concluded to deed it to Charlie's wife, believing that he could trust a mother to take proper care of her children. When this was concluded, Hallgarth called Charlie in, and told him that he had made up his mind what he was going to do, and instructed him to ' have Marsh come up

prepared to make a deed.'" Witness, continuing, says: "The understanding with Sib. was — I reasoned with him in this way: I says, 'After you make this deed out, put it up in escrow in the bank.' Q. You say that you suggested the deed should be sent to the bank or some place in La Grande, to be left in escrow? A. Yes. Q. Did he express his intention of doing so? A. No; he didn't express any intentions of doing anything particularly. He simply wanted to talk to me as a friend about the matter, and see what suggestions I could make to him, and he appeared to think that a suggestion of a deed to Mrs. Hallgarth, and holding the deed himself until after his death, or placing it where it could not be placed on record until after his death, was the very thing he was going to do. Q. That was the plan that was discussed between you and him? A. Yes, sir. Q. This matter of placing the deed so that it could not be put on record,— I presume his intention in that was so that in the possible event of his getting well that he could recall the deed? A. So that he could recall the deed."

John Ross, being called as a witness, says that he was a nurse in attendance upon Sibrit Hallgarth in his sickness; that when the deed was witnessed Marsh took it to see if it was correct, and when it came back " Sib." handed the deed to Charlie, and said, "Charlie, take this, and put it away, and take care of it."

Charles Hallgarth testifies that Sibrit was his brother; that they were partners in business, and that Sib. had never been married; that he had made his home with witness' family ever since 1868, and that he desired all of his property to go to witness' wife and children; that they had been kind to him, and for this reason he wanted them to have it, and to effect the purpose the deed was made; that he did not want to tie witness up in his business, but wanted him to carry it on without interrup-

tion, the same as he had always done; that after the
deed had been returned from Elgin it was placed under
Sib.'s pillow, and when witness went into the house he
said to him, "Here is the deed under my pillow; I want
you to take that, and take care of it until after my
death, and then have it recorded"; that he did not men-
tion the children in that connection, as the deed was
made out to his wife; that he took the deed, and took
care of it, and had it recorded as directed.   On cross-ex-
amination: "Q. You say that he expressed a desire that
the property — all of his property — should go to Jane
and the children?   A. Yes; he so expressed himself.
Q. Did he express that he wanted them to have it after his
death?   A. After his death, of course.   He didn't want
them to have it before his death.   He didn't know but he
might get well.   He didn't so state.   But he wanted
Jane and the children to have all the property after his
death.   Q. And that was why it was stated, when the
deed was made, that it was not to be recorded until after
his death?   A. That was the understanding,— that they
gave me the deed to take care of.   He took it from un-
der his pillow, and says, 'You take this, and take care
of it'; and he says, 'After my death, have it recorded.'
Q. If he had got well, and wanted it back, would you
have given it back to him?   A. Certainly we would;
yes, sir.   Q. If Sib. had asked for the deed before he
died, would you have given it back to him?   A. Yes, sir.
Q. You say it was handed to you to hold until his death,
and then to be recorded.   I will ask you if, when you
took that deed, you understood that prior to his death —
up until the time of his death — that Sib. should have
the control of it.   A. No, sir; he never made any such
suggestions to me as that.   He gave it to me without any
conditions, voluntarily.   *   *   *   It was given to me
by Sib. himself, voluntarily, as I told you, without any

understanding that it should be given back to him or anything of the kind. He never said a word to me in regard to that. Everything was done, as I have told you, voluntarily."

Delivery is the final and conclusive act in the execution of every deed, as it marks the time when the *locus pœnitentiæ* in either party is precluded and the title has passed. A delivery is effected either by a manual transfer of the deed from the grantor to the grantee, or to some third party for his use, or by the doing of some act, or saying something, or by both, whereby the grantor manifests an unequivocal intention to surrender the instrument so as to deprive himself of all authority over it or of the right to recall it, and to consummate the conveyance : *Fain* v. *Smith*, 14 Or. 82 (58 Am. Rep. 281, 12 Pac. 365) ; *Flint* v. *Phipps*, 16 Or. 437 (19 Pac. 543); *Brown* v. *Westerfield*, 47 Neb. 399 (53 Am. St. Rep. 532, 66 N. W. 439) ; *King* v. *Carpenter*, 37 Mich. 364, 368; *Martin* v. *Flaharty*, 13 Mont. 96 (40 Am. St. Rep. 415, 19 L. R. A. 242, 32 Pac. 287); *Doe* v. *Knight*, 11 E. C. L. 632; *Burnap* v. *Sharpsteen*, 149 Ill. 225 (36 N. E. 1008) ; *Provart* v. *Harris*, 150 Ill. 40 (36 N. E. 958).

In the light of this understanding of what is requisite to the act of delivery, we will examine the testimony, which will entail some recapitulation, and determine the effect of the transaction which is the subject of controversy. There are several material facts relating to it which it must be conceded have been established : (1) The deceased had fully determined in his own mind to invest Jane Hallgarth, the wife of Charles Hallgarth, with the title to his property, believing that she could be trusted to give it to their children as they came of age ; (2) He had definitely concluded that a deed should be employed as the means or instrumentality for making the transfer. His reason therefor was that, having been

in co-partnership with his brother, he did not want to
tie him up or incumber him in his business with a set-
tlement in the probate court; (3) The deed was not to
be recorded until after his death.  Beyond this, it may
be regarded as proven that, before he attempted to ar-
range for the final disposition of his property, he had
fully concluded that he could not recover from his illness,
and that life. with him was of short duration.  Drs.
Brownell and Honan both testify that he first made the
inquiry of them touching the subject, and was informed
that he could not survive longer than about a month,
and his brother testifies that "he was satisfied he was
going to die; no possible show for him to live."  It was
this condition of his health that caused him to attempt a
final adjustment of his business affairs.

Now, as it pertains to a delivery of the deed.  Brow-
nell says: "We told Sib. that, if he got well, he could
destroy the deed, and if he did not get well it should be
given to Jane, and taken care of."  On the cross-exam-
ination he says: "The deed was to be recorded after
Sib. died, and it was not to be recorded unless he did
die.  He was to keep it, and if he died they were to re-
cord it, and if he did not die he was. to do as he chose
with it."  The substance of the understanding that
Marsh derived from Sib.'s conversation was "that the
deed was to be placed in the Farmers' & Traders' Bank,
to be put on record if he should die, and if not to be re-
turned to him." .As near as he could remember, the de-
ceased's words were something like this: "I want the
property so if I don't die, or if I get well, I can have it
back again."  Dr. Honan says he advised him in this
way: "After you make the deed out, put it up in escrow
in the bank."  Later he says, in effect, that it was the
purpose of the deceased in not having the deed recorded
to so place it that he could recall it in the event of· his

getting well. None of these three witnesses, however, saw the transaction closed. The understanding of two of them was that the deed was to be placed in the bank, — as one of them expressed it, in escrow,— and of the other that deceased was to keep it, and it was not to be recorded until he died. Subsequent events show that he did differently from what either of these witnesses understood he intended doing. Brownell says : "He dictated what should be done. They proposed several ways ; he dictated his own way." And Honan says : "He didn't express any intention of doing anything in particular." So, it is apparent that, while he was seeking the advice and opinions of others touching the settlement of his business and the disposition of his estate, he was exercising his own ideas, and depended largely upon his own judgment for its final accomplishment.

Marsh says he advised him that the deed was the preferable instrument to employ, as he would be able to control it, and to recall and destroy it, in case he recovered. But he had made up his mind to make a deed before he sent for Marsh, and he sought his opinion after he came as to the effect of placing it in the bank subject to recall by him, and, if not so recalled, to be recorded after his death ; and Marsh thought such a transaction would pass the title at his death, and he was impressed by Sib.'s conversation with the idea that he intended thus to dispose of the deed. Marsh took the deed to Elgin to attach his notarial seal, and neither he nor Honan saw it afterwards. Brownell thinks that when it was returned the deceased put it under his pillow, and this brings us to the time of its final disposition. Mrs. Hallgarth testified that when the deed was returned deceased handed it to her, and said, in effect, that he deeded her his land, and wanted it to go to her children at his death, and then that she handed the deed back to him,

and he put it under his pillow.    Later she says, "He
gave the deed to my husband to put away for me," but
her understanding of the arrangement was that if he got
well he was to keep it.    Ross saw Sib. hand the deed to
Charlie, and heard him say : "Charlie, take this, and
put it away, and take care of it."    Charles Hallgarth
testified that he said : "Here is the deed, under my pil-
low.    I want you to take that, and take care of it until
after my death, and then have it recorded."    He further
testified that, if Sib. had asked for the deed prior to his
death, he would have given it back to him, but that there
was no suggestion made whatever that Sib. should in the
meantime have control of the deed ; that it was given to
him by Sib. voluntarily, without any conditions or un-
derstanding that it should be given back to him or any-
thing of the kind.

As we have seen, the intention of the grantor should
prevail, and it will determine the question of delivery.
If he had pursued the course which Brownell, Honan,
and Marsh say his conversation indicated that he in-
tended to, it is plain a delivery would not have been ac-
complished, for the reason that he would have retained
the power of recalling the instrument, and title could
not have passed.    But, if it ever was his intention to de-
posit the deed in the bank subject to his subsequent di-
rections, he abandoned it ; for he finally placed it in
the hands of Charles Hallgarth, his brother and partner
in business.    His conversation prior to this time would
seem to indicate that it was his purpose to retain control
of it, and that it should not pass from him absolutely
while he lived.    The fact, however, that he handed the
deed to the grantee, with a direct assertion that he
deeded her his land, is of much significance, and is in-
dicative of a present transfer.    True, she returned the
deed, and the purpose of its return is not fully explained.

Later, he handed it to Charles Hallgarth, with the direction that he should take care of it until after his death, and then have it recorded. The instruction was direct, plain, and specific. There was no alternative condition imposed, and the transaction at that specific juncture would indicate that the deceased supposed he had done an act which constituted a final adjustment of his business affairs, and that nothing else was necessary upon his part for its complete accomplishment. Such a delivery to Charles Hallgarth, as his agent, would have been perfectly consistent with the idea of recalling the deed at any time he saw fit, but, if otherwise, the directions would be indicative of an absolute delivery. There are some things to induce the belief that he was dealing with Charles as his agent. Charles was his partner in business, and a person in whom he apparently had full confidence, and he did not wish to tie him up by entailing a settlement of his estate in probate ; so it is perfectly consistent with the idea of recalling the deed at his pleasure that he should place it in the hands of Charles as his agent.

Mrs. Hallgarth, however, testifies that he delivered the deed to Charles to put away for her, and this is consistent with the idea of a delivery of the deed at the time he handed it to her, remarking, in substance, that he deeded her his land. Mrs. Hallgarth seemed to think the understanding was that the deed was to take effect only in case of Sib. Hallgarth's death, but there was some confusion in her mind about it, while Charles says it was delivered to him without any attendant conditions except the direction that he take care of it and have it recorded after his death. When asked if he would have returned the deed to Sib. if he had recovered and wanted it back, he answered that he would ; but what he would have done under contingencies that did not arise is sig-

nificant only of the feeling that the parties entertained for each other, and not that he was under any obligation to do so. It may have been that, if Sib. had recovered, Charles and wife would have been willing to reinvest him with the property. But there was no recovery, and the deceased was satisfied at the time that he could not get well. The contingency of getting well was very slight in his mind, and it is not altogether apparent that it was seriously considered as a factor in the transaction. He never said a word about the deed subsequently, nor did he assert ownership or control over the property in any form, but, on the contrary, treated the transaction as accomplishing the final adjustment of his business affairs. While his intention is not entirely clear, from the surrounding and attendant circumstances, and from what he himself said and did, we are forcibly impressed that the act of handing the deed to Mrs. Hallgarth, and the attendant expression that he deeded her his land, evinced a purpose to effect a present delivery.; and that his subsequent act of placing the deed in the care of Charles, to be recorded after his death, was for her use and benefit, but with a design to place it within the power of Charles, in obedience to the wish of the deceased, to protect it from record until after his death. We are impelled, therefore, to hold that an absolute delivery of the deed was accomplished, which took effect at the instant of delivery. For cases of some analogy in support of the holding, see *Hoffmire* v. *Martin*, 29 Or. 240 (45 Pac. 754) ; *Brown* v. *Westerfield*, 47 Neb. 399 (53 Am. St. Rep. 532, 66 N. W. 439) ; *Hinson* v. *Bailey*, 73 Iowa, 544 (5 Am. St. Rep. 700, 35 N. W. 626) ; *Bury* v. *Young*, 98 Cal. 446 (35 Am. St. Rep. 186, 33 Pac. 338) ; *Trask* v. *Trask*, 90 Iowa, 318 (48 Am. St. Rep. 446, 57 N. W. 841) ; *Sneathen* v. *Sneathen*, 104 Mo. 201 (24 Am. St. Rep. 326, 16 S. W. 497).

This requires a reversal of the decree entered in the court below, and a dismissal of the complaint; and it is so ordered.

REVERSED.

Decided at PENDLETON, 13 August; rehearing denied 17 October, 1898.