Argued January 18, decided January 23, 1912.

## FOOTE v. LICHTY.

[120 Pac. 398.]

DEEDS—VALIDITY—EVIDENCE—ADMISSIBILITY.

1. In a suit to cancel deeds deposited in escrow for delivery on grantor's death, evidence that grantor had characterized a visit from relatives, not the grantees, as a quest for a dead man's shoes, and said that they

seemed to regret it because he did not die, was admissible in favor of the grantees toward whom grantor felt deeply grateful.

DEEDS—DELIVERY IN ESCROW—PASSING OF TITLE.
2. Whether the deposit of a deed in escrow for delivery on grantor's death passes title, depends on whether the grantor intends to and does retain control over it after such delivery.

DEEDS—DELIVERY IN ESCROW—PASSING OF TITLE—EVIDENCE—WEIGHT.
3. Evidence *held* to show that grantor, under deeds deposited in escrow for delivery at his death, surrendered control of the deeds so as to constitute a delivery precluding subsequent cancellation by him.

From Washington: JAMES U. CAMPBELL, Judge.

Statement by MR. JUSTICE BURNETT.

This is a suit by John A. Foote against W. J. Lichty, Frank Lichty, Lydia Gardner, Emma Hamel and E. B. Tongue.

The substance of the complaint is that at some date in 1908, being then and ever since the owner of a tract of 162 acres of land in Washington County, the plaintiff, at the solicitation of the defendant W. J. Lichty, but without consideration or the knowledge of any of the defendants except W. J. Lichty and E. B. Tongue, executed four conveyances, one each in favor of the defendants W. J. Lichty, Frank Lichty, Lydia Gardner, and Emma Hamel, which, taken together, included the whole of said premises. He charges that the four deeds, immediately upon their execution, "were deposited with the defendant E. B. Tongue in escrow, to be delivered to each of the defendants named in said several deeds of conveyance upon the death of the plaintiff herein, provided the plaintiff herein should not, prior to his death, demand the possession thereof from the said defendant E. B. Tongue; and, at the time of the delivery of said four deeds of conveyance to the said defendant E. B. Tongue, it was understood and agreed that said deeds of conveyance should not be delivered to the defendants W. J. Lichty, Frank Lichty, Lydia Gardner, and Emma Hamel, until after the death

of the plaintiff herein, in the event the said plaintiff herein should not in the meantime demand possession thereof." He further avers that, although prior to commencing this suit he has demanded immediate possession of the deeds from Tongue, the latter refuses to surrender them. Then, without any allegation that either of the defendants threatens or intends to record the deeds, he says, in substance, that if Tongue shall deliver them to the other defendants, and they are recorded, they will be a cloud upon his title, and the defendants, other than Tongue, claim some interest in the land by virtue of the deeds, but the same is void. He prays that the cancellation of the deeds and his ownership of the property be decreed.

The answer traverses the whole complaint, except as otherwise stated, and alleges that without solicitation thereto by either of the defendants the plaintiff on November 25, 1908, for a value consideration, executed and delivered to each defendant a deed for a certain described parcel of the land and "placed said deeds of conveyance in the possession of the defendant E. B. Tongue, and instructed him to retain the same in his possession until the death of the plaintiff, and then to deliver to the other defendants, respectively, the deeds to their respective tracts of land as above described." After joining issue on material allegations of the answer, the reply reiterated an allegation of the complaint to the effect that ever since the execution of the deeds plaintiff has been in possession of the property, enjoying the rents, issues, and profits, and that neither of defendants has been in possession of any part, except that W. J. Lichty has been in possession as tenant of plaintiff. The circuit court, after hearing, made findings of fact and conclusions of law for defendants, and from the resulting decree plaintiff appeals.

AFFIRMED.

For appellant there was a brief over the names of *Messrs. Bagley & Hare* with an oral argument by *Mr. George R. Bagley.*

For respondent there was a brief with an oral argument by *Mr. Samuel B. Huston.*

MR. JUSTICE BURNETT delivered the opinion of the court.

1. All other questions raised about the admissibility of testimony in this case are grouped about and are ancillary to the principal one of whether the deeds mentioned were delivered so as to complete the process of passing title to the land from the plaintiff to the respective grantees.

It is disclosed by the evidence that the plaintiff is a man above 70 years of age who never married. He came to Oregon many years ago, leaving all his relatives in the state of New York, and had but little if any communication with them until within the last few years. He lived for about 25 years in the Lichty family, of which Mrs. Eliza Lichty, widow, now deceased, was the head and the defendants here, except E. B. Tongue, were the children. The plaintiff was cared for by the Lichtys as one of the family without charge, and he rendered them some small services in return, such as keeping the farm implements in repair, also without intending to claim any fee or reward. It seems that they all lived together on a farm owned by the plaintiff, and that the Lichtys did the work and kept up the place; but whether as tenants or otherwise is not clear. The plaintiff, having acquired considerable property during his life in Oregon, on July 3, 1908, made a will, whereby he provided for his relatives in a residuary clause, and, besides certain cash legacies to other persons, devised the land in question here to Eliza Lichty for and during her natural life, and at her death to her children, defendants in this suit. It further appears in testimony that prior to the execution of this will he

Sig. 18

was visited by his brother and sister, Perry Foote and Amanda Rector, of New York. and he gave them, respectively, $6,000 and $5,000, after which they returned to New York. Another brother, William C. Foote, afterwards came from New York and visited him about ten days. This brother testifies, in substance, that the plaintiff told him that the Lichtys had helped him make his money, had made a good home for him, and were entitled to the land in question for what they had done for him, and that he was going to see that they got it. According to this witness, the plaintiff, in conversation with him, substantially characterized the visit of Perry Foote and Mrs. Rector as a quest for a dead man's shoes, and said that they seemed to feel bad because plaintiff did not die. At the hearing, plaintiff's counsel earnestly combated the introduction of testimony of the circumstances thus detailed. We think, however, that they are proper for consideration, because, when the quality or purpose of a person's act is to be determined, it is at least helpful if we may have light on the motive which impelled him to do as he did. If it be shown that an intimate friendship of long standing existed between the Lichtys and the plaintiff, and that he had a deep sense of gratitude toward them for their kindness to him, a situation is presented quite different from the bare execution of the deeds which, standing alone, might be attributed to the childish impulse of a "foolish, fond old man."

2, 3. The vital issue of the cause is whether the deeds were delivered within the meaning of the law. After an exhaustive consideration of the precedents in the case of *Fain* v. *Smith,* 14 Or. 82, 90 (12 Pac. 365, 370: 58 Am. Rep. 281), Chief Justice LORD sums up the matter thus:

"The result of the authorities is that, after a writing has been signed and sealed and acknowledged, any acts or words or circumstances decisive of the intention of the grantor to consummate and to part with it are sufficient to constitute a delivery and give it validity as a deed."

In *Hoffmire* v. *Martin,* 29 Or. 240, 243 (45 Pac. 754), this court said that the solution of the question as to when a deed, executed and deposited with a stranger to be delivered to the grantee upon the death of the grantor, is effectual to pass the title, "depends on whether the grantor intends to and does retain dominion and control over it after such delivery, or parts with the possession and control of it absolutely at the time of delivery." The decision there was that, if such control and right to its return was retained by the grantor, the title would not pass; "but if the grantor parts with all dominion and control over the deed, reserving no right to recall it or alter its provisions, it is a good delivery, and the grantee will, on the death of the grantor, succeed to the title." Other cases illustrative of the principle are *Payne* v. *Hallgarth,* 33 Or. 430 (54 Pac. 162) ; *White* v. *White,* 34 Or. 141 (50 Pac. 801: 55 Pac. 645) ; *Swank* v. *Swank,* 37 Or. 439 (61 Pac. 846) ; *Reeder* v. *Reeder,* 50 Or. 204 (91 Pac. 1075). With the rule thus established as a major premise, let us examine the testimony to ascertain if the minor premise is established to the effect that the plaintiff surrendered to Tongue the control of the deeds so as to constitute a delivery.

The plaintiff was a witness in his own behalf. As he was unable to attend court, the judge, at the request of counsel, attended at plaintiff's room in the hotel where he was then living and heard the case there as far as this witness was concerned. The plaintiff testified in substance, that at the time the deeds were executed, November 25, 1908, he sent for Mr. E. B. Tongue to come to his residence in the country for that purpose. Mr. Tongue had prepared the deeds according to plaintiff's directions, and after they were signed, witnessed, and acknowledged, plaintiff said that Tongue should take them and put them in a safe and keep them, and after he was dead they were to be recorded. On the point of whether he was entitled

to receive them back again on demand, his questions and answers are here given:

Q. "Was there anything said at that time that you should not have the deeds back if you wanted them?"
A. "No."

Q. "What was said?"
A. "There was nothing said about the deeds. They was just made, and that was all there was of it."

Q. "Was there a will executed at the same time, Uncle John?"
A. "Yes, sir."

Q. "Was there anything said about the will in connection with the deeds as to what was to be done with the will?"
A. "They were to be kept together."

Q. "Did you intend, at the time those deeds were delivered to Mr. Tongue, that you should part with the title to them and never get them back again? Did you intend that?"
A. "No."

Q. "Did you intend at any time that the title to your land should be vested in the four grantees named in the deeds, Emma Hamel, Lydia Gardner, W. J. and Frank Lichty, that they should have their titles right there at that time?"
A. "No."

The testimony thus quoted is the testimony of the witness on direct examination in response to leading questions propounded by his own counsel. On cross-examination he testified as follows:

Q. "What did you tell Mr. Tongue you wanted when he came there? Did you tell him you wanted him to make those deeds out?"
A. "Yes, sir."

Q. "Did you tell him how you wanted it divided?"
A. "Yes, sir."

Q. "Did he make them out to suit you?"
A. "Did he make them out to suit me? Yes, sir."

Q. "You signed them all right, did you, and were satisfied, were you?"

A. "It was all right then."

Q. "What did you tell him to do with the deeds?"

A. "I told Mr. Tongue to take them and keep them."

Q. "Did you tell him what to do with them after you were dead?"

A. "After I was dead they were going to execute them."

Q. "They were to be put on record, were they? Is that right?"

A. "Yes, sir; after I was dead they were to be recorded."

Q. "What caused you to change your mind, Mr. Foote?"

A. "Well, you know a wise man changes his mind, but a fool never does."

Q. "You have changed your mind since you have made the deeds, have you?"

A. "Yes, sir."

On redirect examination he testified thus:

Q. "At the time those deeds were left with Mr. Tongue, was there anything said at that time that you should never get the deeds back if you wanted them?"

A. "No, there was nothing said."

Q. "Was there anything said that you should not get them back if you wanted them?"

A. "No, there was nothing said but to take them and to keep them."

Q. "He was simply to take them and keep them?"

A. "Yes, sir."

Q. "And after your death they were to be recorded?"

A. "Yes, sir."

This is substantially all the testimony in chief on the part of the plaintiff respecting the circumstances of making and delivering the deeds.

On behalf of the defendants, E. S. Shattuck testified that about March, 1909, he had a conversation with the plaintiff while they were upon the land in question, when the latter said:

" 'I have given it to the Lichty heirs — the Lichty children.' I wouldn't say which; I think he said children."

Corwin Foote, a nephew of the plaintiff, testified that the latter told him he was going to give the land in question to the Lichty children—40 acres apiece. This conversation took place on the day of the funeral of Eliza Lichty. Mrs. J. W. Sewell was an attendant on Mrs. Lichty in her last sickness. This witness testified that on that occasion the plaintiff, at the bedside of the dying woman, had this conversation with her, "You have been very good to me." And Mrs. Lichty said, "I have tried to be, and my children will do the best they can." And he said: "I will remember your children, and I intend to have your children to have this place." And he said, "I will deed it to the children." And she said as near as I can remember, "I am ready to go." J. W. Sewell, her husband, was present on the same occasion, and he attributes these words to the plaintiff, "I am going to make deeds to this place to these children." John M. Wall, an attorney, testified that in March or April of 1908 he prepared a will for the plaintiff at his request, in which he bequeathed the land in question to Mrs. Lichty for her life and then to her children. E. W. Carnahan was a witness to the execution of the deeds in question. He said that, at the time the deeds were signed, "Mr. Foote said to Mr. Tongue to hold those deeds, those papers, until the wind was out of him and then put them on record."

As far as the record discloses, these witnesses already noted are without any pecuniary interest in the result of this litigation. The most important witness on this branch of the case is E. B. Tongue, who, although he is a nominal defendant, seems to be indifferent and to act as a mere stakeholder of the deeds. He testified substantially that after he had drawn the will of July 3, 1909,

already alluded to, the plaintiff sent for him and wanted him to draw up deeds conveying the property directly to the Lichty children. The plaintiff had caused a plat of the land to be prepared showing the shares he wished to be conveyed to each defendant and sent it to Mr. Tongue. Tongue testified as follows:

"I then drew up the deeds, and, I believe, in company with Mr. Sewell, we went out in his buggy, possibly in mine, I guess in mine; we went out there and found Mr. Foote, and Mr. Foote told me what he wanted, and I told Mr. Foote I didn't see any reason for making these deeds, and he said he would like to have them made and left with the will, and I explained to him that that wouldn't do any good as I viewed the matter, and I told him that the only way that I thought the deeds would be any good was for him to execute them and give them to them, let them take them; and he said he didn't want to do that because he was afraid that they would place them on record, and if they placed them on record he said, 'They will make a lot of trouble for me' or 'them people.' He didn't mention any names. And I told him he could make a thousand deeds, but, as long as you don't deliver them to the people to whom you intend to deed the land, they are not worth the paper they are written on; that the making of a deed or check has no effect unless it is delivered to the people it is intended for. And he finally insisted on the deeds being drawn, and I explained to him that there must be a delivery of the deeds before they would have any effect; and he then asked if he could not deliver the deeds to me and for me to see they were not put on record. And I told him, yes, it would be perfectly legal for him to execute the deeds and deliver them to a third person if it was meant that the delivery was to be to the grantees; but he must intend that the title should pass by that delivery. And he said, 'can't you take them and keep them, and I will rely upon you to see that they are not recorded.' So the upshot of the matter, after explaining it to him, that he would deliver them to me and it would be my duty to see that they were not put on record, and he would not be harassed about it. I think at that time he said he didn't want to rely upon a will

because he thought they would break it. * * But he wanted to be sure that these people would get that land; that seemed to be what he had in mind."

This witness testified that, before going out to draw the deeds for the plaintiff, he examined the decision of this court in the case of *Swank* v. *Swank*, 37 Or. 439 (61 Pac. 846), and advised the plaintiff with that case in view. The following questions and answers appear in the testimony of the witness Tongue:

Q. "After Mr. Carnahan came and the deeds were witnessed and executed, and you were about ready to leave, did you say anything to Mr. Foote then about the deeds?"

A. "Yes, sir; I think Mrs. Will Lichty about that time was standing in the door, or around there somewhere, and it runs in my mind there was some other woman there; but I am not sure about that, and I think Carnahan was there and Sewell was there; and I wanted Mr. Foote to repeat, so these people would hear it, what I was to do with those deeds, and he repeated in their presence that I was to take those deeds and to take care of them, and as soon as he was gone to put them on record and turn them over to these people."

Q. "Was there at any time during the execution of those deeds any statements or claim or understanding that Mr. Foote should have the right to recall those deeds?"

A. "None whatever. At that time the only thing that seemed to concern the old man was that these people wouldn't get that land through some hook or crook. The sole idea with him seemed to be that they should have this land."

Q. "Did you ask him what particular tract he wanted deeded to each party personally?"

A. "Yes, sir; and I explained the deeds to him and explained that plat, and he talked for a little while of changing, and he thought for a while that instead of being cut in squares he thought maybe it would be better to cut it lengthwise, so each one would have a frontage on the road. He wanted to know how those people would be situated back there that didn't have a frontage on the road."

Q. "Did you read them over to Mr. Foote?"

A. "He read them over himself. He didn't seem to want anybody to read them to him. He was probably half an hour reading them."

Q. "You used the same character of language you used here?"

A. "Yes, sir; there was no misunderstanding as to what the old gentleman wanted at that time, and that he understood what he was getting, and he got what he wanted."

Q. "Are you sure Mr. Foote understood all that you told him about delivery of the deeds?"

A. "Yes, sir."

Q. "That the words 'beyond recall' were used there?"

A. "I don't know. I told him he would have to put it in the possession of some one where he could not get it back. It was explained to him that he must pass the title, that he must let the title go, and I made it just as plain to him as I could."

Other testimony by some of the defendants and their relatives was given respecting the declarations of the plaintiff as to his intention before making the deeds, and as to the effect and purpose of the deeds after their execution, and the use that was to be made of them; but enough has been given here to illustrate the situation. The deeds were executed on the 25th day of November, 1908, and we think the great weight of the testimony is in favor of the proposition that at that time the defendant fully intended to put beyond any question his purpose of conveying the land to the defendants, the Lichty children, so as to prevent any one else from getting it. He had already provided for them in that respect in his will; but he feared the will would be broken, and hence he wanted to make assurance doubly sure by conveying the property to them in such a way that they would enjoy the benefits of his bounty. The natural import of his language and conduct, as detailed by himself, would be that Tongue was to keep the deeds, and, when the

grantor should be dead, Tongue was to see that they were recorded. The rule is well established in this State that such conduct is proof of the present intent of the grantor to then convey the land to the grantee. The weight of authority seems to be that, if the grantor would have a different effect given to his acts, he must at the time of putting the deeds in the possession of the stranger append thereto the condition affirmatively that on the demand of the grantor they should be returned to him. If nothing is said on that subject, the transaction will take the natural course of a conveyance.

The case seems to have been carefully considered by the learned judge who presided at the trial, and we have no cause to differ from his conclusion.

The decree of the court below is affirmed.

AFFIRMED.