# Staunton

CYNTHIA J. GARRETT, ET ALS. v. NANCY C. ANDIS.

September 22, 1932.

Present, Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*L. P. Summers* and *George M. Warren,* for the appellants.

*E. W. Potts,* for the appellee.

HOLT, J., delivered the opinion of the court.

The defendant here, who was a widow, Mrs. Nancy C. Wooten, forty-two years old, on November 24, 1921, married Henry S. Andis, a widower, then about seventy-four. Mr. Andis died in January, 1930, intestate, and was survived by her and by two or possibly three daughters. He was possessed of a farm of about two hundred acres and of

personalty valued at between twenty-five hundred and three thousand dollars.

In this suit his daughters, Cynthia J. Garrett and Mattie W. Kilby, asked that the widow's interest in their father's estate be ascertained and decreed, that his land be partitioned, and that the estate of a third sister, Annie L. Bordwine, be likewise divided between them. They say that she has not been heard from for seventeen years and is presumed to be dead.

The widow has answered, setting up an antenuptial contract under which she claims all of the personal estate and a life interest in the realty. The terms of that contract she claims were preserved in a deed and will executed by her husband after marriage and later destroyed by him.

The trial court was of opinion that the antenuptial contract had not been proven and so decreed. It held that the will was legally revoked, but that the deed was delivered, and in accordance with its terms passed to the wife a life estate with the remainder in fee to the children. It further charged, as against this life interest, certain sums which the wife had received from her husband.

For the plaintiffs it is claimed that the deed was not delivered, and the refusal of the court to so decree is assigned as error.

The defendant testified that the deed was delivered to her, and asserts that it and the will, which were both destroyed by Mr. Andis, evidenced an antenuptial contract which gave a life estate in his land, and his personalty absolutely. The refusal of the court to so decree is assigned as cross-error.

Mr. Andis, a widower, sent ambassadors to Mrs. Wooten with propositions looking towards matrimony, and directed them to ascertain if it would be agreeable for him to call in person and continue negotiations thus formally begun. He said to his representatives that he "aimed to make what he had to her for her lifetime." His message was delivered. Permission to call was granted and availed

of. Marriage was agreed upon, and, as we have seen, was afterwards consummated. Mrs. Andis' testimony definitely supports the antenuptial contract set up in her cross-bill. It is fairly certain that there was some such agreement, and that in their alliance romance played a minor part.

This agreement was not carried out and nothing was done for some time, although Mr. Andis once or twice said to his neighbor, Mr. Botts, a justice of the peace, that he wished him to prepare a will and deed. Botts did finally prepare these instruments. They were written in March, 1923. The deed was signed and acknowledged and the will was signed and witnessed. They gave to the wife what she claims had been promised to her.

Botts' evidence relative to the delivery of the deed is:

"Q. What was done with the deed after it was executed?

"A. Well, he first reached this deed to Mrs. Andis and asked her to read it, and there was some complaint about her glasses that she could not see how to read it, and I read it to her. Mr. Andis took the deed and will and placed them, as well as I can remember, in a brown envelope and handed it to Mrs. Andis, and they both went into an adjoining room and I do not know where they put it.

"Q. Was that deed actually delivered to Mrs. Andis by Henry Andis?

"A. Yes, sir, the deed and will both.

"Q. Have you any way of fixing the date on which this deed and will were drawn?

"A. Yes, sir, right during that time, the day before I prepared this deed I was keeping books at the sale of James Stout, in March, 1923, that might make it more definite.

"Q. Is that a part of the record that you made at that time?

"A. That is his wife's, I prepared the notice and fixed the books, this is March 17, 1923.

"Q. It would be March 18, 1923, that you prepared these papers?

"A. Yes, sir.

"Q. Did you see the parties place the deed and will in the trunk?

"A. No, sir.

"Q. Did you see them go toward the trunk?

"A. I do not know what was in there they went into the adjoining room.

"Q. Who was carrying the paper when they went into that room?

"A. Mrs. Andis, she was carrying the envelope that contained the deed and will."

He knew nothing about what was afterwards done with them. Mrs. Andis said that the deed was delivered to her by her husband and that they put it in a trunk. He opened the trunk and she put the deed in it and he covered it up with some old papers. He kept the trunk key and told her that the deed should not be recorded until after he was dead. This was his trunk and he kept in it things deemed valuable. She said that such little things as she had of value were also kept there. The deed was not afterwards in her possession, and she does not appear to have seen it again.

In the early part of 1929, her husband told her that he had destroyed both the will and the deed. It is possible that she had become suspicious and had found this out herself. In some manner she did go into the trunk and found these papers gone. This action of her husband angered her, and she seems to have denounced him in unmeasured terms. Some sort of a settlement was patched up.

Plaintiffs in their petition for appeal say: "In the year 1928, about two years after the deed had been destroyed by the grantor, his wife, Nancy C. Andis, went into his trunk by some means, and without his knowledge, to see if these papers were there. They had been destroyed, but she found therein certificates of deposit, belonging to her husband, amounting to two thousand five hundred ($2,500.00) or three thousand ($3,000.00) dollars. She re-

moved them from the trunk and told her husband she had done so because he had destroyed the papers. She also told him that, in view of his act, she would destroy the certificates unless he would agree to give her one-half of them, and that she would accept one-half of the proceeds of these certificates in full settlement of all claims that she might have against his estate. Henry Andis, after much discussion and threats on the part of the wife, finally agreed to her proposition, and he and she went to the First National Bank of Abingdon, Virginia, and placed the proceeds of these certificates on deposit, subject to check. He gave her one-half of the proceeds, which she, at one time, stated amounted to one thousand seven hundred ($1,700.00) or one thousand eight hundred ($1,800.00) dollars, but which, upon the stand she stated amounted to one thousand two hundred and forty ($1,240.00) dollars. Nancy C. Andis afterwards stated to Mrs. Sarah E. Sproles and other witnesses, that she had accepted the one-half of the proceeds of these bank certificates in full settlement of all of her demands upon her husband, and that she and Mr. Andis had reconciled their differences and would now 'live together like two children.' "

There is no competent evidence to sustain any antenuptial contract. There was no writing such as is required by the statute of frauds, Code, sec. 5561, subsec. 5. *Hannon* v. *Hounihan*, 85 Va. 429, 12 S. E. 157. The deed and will relied upon were written long after the marriage.

The assignment of error set up in the cross-bill which seeks to sustain such a settlement is not well taken.

Was there a delivery of the deed? If it was delivered, title passed and is not affected by the fact, if it be a fact, that it was afterwards returned by her to the husband and by him destroyed; indeed, her consent to its destruction, given at some later time, would have amounted to nothing. *Furguson* v. *Bond*, 39 W. Va. 561, 20 S. E. 591. One might as well attempt to pay his debts by burning his bonds.

■ Intent governs delivery. Of course one would not afterwards be heard to say that he did not intend a delivery unequivocally made, but intent is of the utmost importance in doubtful cases, and it is then that relevant evidence of facts and circumstances leading up to the delivery becomes of importance.

It is not entirely accurate in the instant case to say that possession was retained. These were simple people and it was in this trunk that they kept their treasures. Most of them belonged to the husband for she had few. They had no other place to put the deed and it is not unreasonable to assume that it was placed there by common consent for safe-keeping. He put it in an envelope, gave it to her, and she put it in the trunk.

■ It is sometimes said that no presumption of non-delivery arises from the grantor's possession where a life estate is reserved since the deed is not to take effect until after his death. *Hill* v. *Kreiger,* 250 Ill. 408, 95 N. E. 468; *Buck* v. *Garber,* 261 Ill. 378, 103 N. E. 1059; *Humphreys* v. *Humphreys,* 300 Ill. 46, 132 N. E. 774; *Payne* v. *Henderson,* 340 Ill. 160, 172 N. E. 173.

■ Formalities of delivery necessary in deeds of bargain and sale are not required in voluntary settlements.

"And where a deed was intended to be considered as delivered, it will not, as between the grantor and the grantee, be invalid for want of delivery, because of the fact that it remains in the grantor's possession. Likewise, there may be a sufficient delivery where the grantor by his acts or words expresses an intention to deliver the instrument and there is nothing to qualify the delivery. This is particularly true where a conveyance is one of voluntary settlement and the more so where the beneficiary is unable to protect his own interests, as where he is a child. Where the grantor reserves a life estate in the property and its possession and control, his retention of the deed is not inconsistent with the idea that a delivery was intended." 18 C. J., p. 201.

"In cases of voluntary settlements, courts have gone great lengths in sustaining the validity of deeds, without affirmative proof of any delivery, and the earlier cases hold that a voluntary settlement, fairly made, is binding in equity, unless there is clear and decisive proof that the grantor never parted or intended to part with possession of the deed, and that if he retains it, there must be other facts to show that it was not intended to be absolute." *Wallace* v. *Berdell*, 97 N. Y. 22.

These cases support this general proposition: *Souverbye* v. *Arden*, 1 Johns. Ch. (N. Y.) 256; *Bunn* v. *Winthrop*, 1 Johns. Ch. (N. Y.) 336; *Scrugham* v. *Wood*, 15 Wend. (N. Y.) 545, 30 Am. Dec. 75; *Tarbox* v. *Grant*, 56 N. J. Eq. 199, 39 Atl. 378; *Riegel* v. *Riegel*, 243 Ill. 626, 90 N. E. 1108, 1109; *Foote* v. *Lichty*, 60 Ore. 542, 120 Pac. 398.

This subject is comprehensively dealt with by Prentis, J., in *Payne* v. *Payne*, 128 Va. 33, 104 S. E. 712, 717. He was of opinion that the case of *Wallace* v. *Berdell, supra,* went too far, and that the true rule appears in *Fisher* v. *Hall*, 41 N. Y. 416, namely, that in cases of this character we cannot "wholly dispense with any evidence of delivery." See, also, *Mumpower* v. *Castle*, 128 Va. 1, 104 S. E. 706. In *Leftwich* v. *Early*, 115 Va. 323, 79 S. E. 384, it was said that a deed may be declared to be delivered though the grantee be absent.

The conclusions of Judge Prentis are well supported by authorities.

Where the deed is one of gift and not of bargain and sale, and is made pursuant to an antecedent promise or agreement, some evidence of delivery is still necessary, but it need not be conclusive. Here we have positive testimony supporting delivery, supported in turn by circumstances out of which the transaction grew. Dealing at arm's length as they did, it is not probable that this comparatively young woman would have abandoned her home, sold it, and married a man twenty-five or thirty years her senior unless some provision had been promised her—at least, this is a

reasonable presumption. That he did make such a promise is abundantly proven. He was slow to comply but it was on his mind and he spoke of it to the justice of the peace once or twice before the deed was written. Manifestly it was written in compliance with a promise previously made and conformed to it. For final compliance the insistence of the wife probably in part accounts. Had this deed been found intact among his papers we would have a simpler case, but it was burnt by him—burnt, however, six years after its execution and when he had probably repented of his purpose. This act is unquestionably of evidential value but is not sufficient to overcome the fact that the execution of the deed fulfilled a promise and contract, and the further fact that delivery of the deed is unequivocally testified to by two witnesses, one at least of whom was disinterested and was a man of position in the community. Nor do we attach importance to the fact that Mrs. Andis may have told others that possession had continued with her husband; for unquestionably it was in her husband's trunk and he habitually kept the key.

Our conclusion finds further support in the fact that when his wife reproached him for his conduct, he made a payment which he declared was in full settlement of her claim.

Mrs. Kilby, one of the plaintiffs, testified that her father told her that "she (Mrs. Andis) had agreed to take one-half and be satisfied and said 'I've given her all I'm going to give her.'" Mrs. Andis doubtless thought that her life estate was gone when her deed was burnt, and so took what she could get on the theory that half a loaf is better than nothing, and this in all probability accounts for her failure to assert her rights promptly when her husband died.

We do not mean to say that all of this is perfectly clear. Many of the witnesses were plain people and their testimony is at times confusing, but the facts as we have stated them find in it substantial support, sufficient in the

judgment of the learned trial judge. His conclusions are presumed to be right, and error has not been shown.

The trial court charged against the life estate of the widow as an advancement $1,200 paid by him to her. Advancements, properly speaking, are gifts by anticipation from a parent to a child. Bouvier's Law Dictionary. Total intestacy was formerly necessary, but partial intestacy is now sufficient. Code, section 5278.

The doctrine of hotchpot has been further enlarged by statute to apply in certain circumstances to any person. Code, section 5237, declares that "A provision for or advancement to any person shall be deemed a satisfaction in whole or in part of a devise or bequest to such person, contained in a previous will, if it would be so deemed in case the devisee or legatee were the child of the testator; and whether he be a child or not, it shall be so deemed in all cases in which it shall appear from parol or other evidence to have been so intended."

The decedent left no legacy to his wife against which any gift can be charged. His will in her favor he destroyed in his lifetime, and we would have to reinstate this burnt will in order to charge anything against it. He did give her $1,200, but $500, part thereof, he gave long before the will and deed were destroyed. Their destruction can bear no relation to this $500 gift, before bestowed. He did, when their loss was discovered, give her $700, given and taken in satisfaction of such rights as she might theretofore have had. As we have seen, she is not bound by her acceptance but manifestly it would be inequitable to permit her to take under the deed and to keep what she took in lieu of it, and so we think the trial court was right in substance. It should have charged her, however, not with $1,200, but with $700.

With this single modification the decree appealed from should be affirmed, and it is so ordered.

*Modified and affirmed.*