# Richmond

## Sadye L. Lavenstein v. Charles E. Plummer, Trustee.

April 13, 1942.

Record No. 2520.

Present, All the Justices.

The opinion states the case.

*J. H. Lavenstein,* for the appellant.

*Willis W. Bohannan,* for the appellee.

HOLT, J., delivered the opinion of the court.

For some years prior to 1931, M. E. Lavenstein, H. H. Lavenstein and A. L. Lavenstein were prominent business men in Petersburg. As the Lavenstein Corporation. they conducted a department store. As the Lavenstein Realty Corporation, they dealt in real estate, as they did through the DuPont City Development Company.

As of July 13, 1931, the Lavensteins in their several capacities were indebted to the Petersburg banks in these sums: There was then due from the Lavenstein Corporation to the National Bank of Petersburg $18,718.92, and from the Lavenstein Realty Corporation, $22,194.49—a total of $40,913.41. There was also due from these corporations to the Virginia National Bank of Petersburg $38,350.00, all of which was secured by collateral.

At that time the Lavensteins needed more money and applied to the National Bank of Petersburg for an additional loan of $25,000. This loan the bank was willing to make provided it was adequately secured and suggested that the wives of the Lavensteins endorse the note or notes to be executed; that life insurance policies be deposited and that certain deeds of trust be given. These wives declined to become endorsers, but life insurance policies were assigned and deeds of trust given.

Mrs. Sadye L. Lavenstein, wife of A. L. Lavenstein, was willing to and did execute as collateral a note for $4,000, secured by a trust deed on certain real estate in Petersburg. Mr. A. L. Lavenstein estimates the value of this collateral as of July, 1931, as $150,000, exclusive of the life insurance policies. From them there was later realized $26,093.39; that is to say, the value of these securities was then somewhere around $175,000.

It is the contention of Mrs. Lavenstein that her $4,000 note

and the trust deed securing it were executed with the understanding that when the sum of $25,000 should have been paid on the Lavenstein indebtedness, independent of the sources from which it came, her note should be returned to her and her trust deed released. It is the contention of the trustee that all collateral deposited with the bank when the $25,000 loan was made was given to secure not only the money then loaned but all of the Lavensteins' preexisting indebtedness; that the assignment was unconditional and given to secure all indebtedness then or theretofore incurred.

It was the intention of Mr. Plummer, who was trustee in the $4,000 trust deed, to sell the land conveyed to him and to apply the proceeds of sale on the general indebtedness due to the National Bank of Petersburg. He was president of that bank when the $25,000 loan was made. This suit was brought to enjoin that sale, and in accordance with the prayer of the bill, a temporary injunction issued. It was afterwards dissolved, and it is from that decree of dissolution that this appeal has been taken.

This case turns upon evidence. Little law is involved and as to it there is no dispute. Since the evidence is in the form of depositions, we take it *de novo*; subject, however, to this qualification: The judgment of the chancellor below is presumed to be correct and stands until error has been pointed out.

Mr. A. L. Lavenstein explained to his wife what the Lavensteins wished to do and what the bank was willing to do. She told her husband that under no circumstances would she endorse for the $25,000 loan. She was willing, however, under certain conditions and as collateral, to give her secured note for $4,000.

"I did tell him that I would be willing to give him whatever collateral I had; which was my lot on Westover Avenue, with the understanding, however, that this would be collateral on a new loan that would be taken care of or reimbursed first. In other words, I told him that I would give this collateral with the understanding that the first money paid back should be applied to this $25,000.00 loan and when the first

$25,000.00 had been paid in that I would get back my collateral note."

This confidential conversation between husband and wife has no evidential value, save that it makes plain the contention which Mrs. Lavenstein is now making.

Mr. A. L. Lavenstein has also testified, in the course of which he said:

"At the time that this loan was being made, Mr. Charles Plummer called a meeting of the Lavenstein brothers, Moses E. Lavenstein, Harry H. Lavenstein and A. L. Lavenstein, in his private law office. He stated that you boys want a loan of $25,000.00. In order to get this loan through—now understand, fellows, I am not asking for any collaterals for the loans that you already have—we are perfectly satisfied with the papers that we are holding—but in order to get this loan through—I would ask that you, individually, furnish me with all the real estate that you may own personally and also your life insurance policies, together with your wives' signatures and their personal properties, if they own same. Moses Lavenstein answered him that we will take this under consideration, and we will bring you a list of what we own personally and we will take the other end of it up with the wives."

He further said:

"I went back on the following morning to see Mr. Plummer. I met him at his office as he was leaving for Richmond. He stated that he had an appointment and had to be in Richmond within the next hour and that I could speak to Mr. Buck Franklin and that when he got back he would take it up with him."

Mr. Franklin was then the bank's vice president. Mr. Lavenstein said that he explained to him the conditions under which his wife was willing to give her $4,000 note.

On the following morning, he was called to the telephone by Mr. Owen, who told him that Mr. Franklin wished to speak to him, whereupon the following conversation over the telephone took place:

"* * * I picked up the receiver and this was his remark: 'Abe, I spoke to Charlie, and it won't be necessary for any of the wives to sign that note, but it will be all right for you to

get your wife to fix up the collateral note, and when this $25,000.00 is paid out, she will get that collateral note back.' I said, 'thank you, *you*, Mr. Franklin, I will attend to this immediately."

He further said that the value of the collateral deposited to secure this $25,000 loan was about $150,000, not including the life insurance policies, and that the reason the other Lavenstein wives were not asked to put up collateral was because they did not have anything to put up.

Mr. S. M. Owen was the assistant secretary for these Lavenstein corporations. This is his account of his connection with this transaction:

"The only connection I had was—while all these negotiations were going on, when the request was made for the wives to endorse, which brought up considerable discussion and argument, and which they finally agreed not to do—Buck Franklin called up and asked for Abe, and in the meantime he explained to me what he wanted to tell him, because Abe was not there. He stated that Abe had been to see him in regard to the wives' endorsements and the $4,000.00 deed of trust note on the Westover Avenue lot, and that I was to tell Abe that they had decided they would not need the wives' endorsements and for him to have his wife execute the deed of trust note, with the understanding that that was for that particular loan and would be returned upon the payment of that $25,000.00 item. In the meantime, before I could hang up the 'phone, Abe came in the store and I told Mr. Franklin to wait a minute and Abe got on the 'phone. I also would like to say that I have known Buck Franklin for a number of years—I knew him when he was Fire Commissioner in Richmond, which might account for his telling me some things which he might not tell anyone."

Mr. Franklin, vice president, with whom this agreement is said to have been made, is now dead.

Mr. Charles E. Plummer was president of the National Bank of Petersburg. That bank was on October 1, 1931, consolidated with the Virginia National Bank of Petersburg. The new bank was known as the First National Bank and Trust Company of Petersburg and of it Mr. Plummer was

president also. He is now president of the Citizens Bank of Petersburg. He said that he was the principal representative of his bank in this matter and that he does not recall that any other bank officer had authority in the matter and that most of his transactions were with Mr. Moses E. Lavenstein.

The First National Bank & Trust Company of Petersburg went into the hands of receivers in 1933. This is his account of what took place when the application for the loan was made:

"When the first request was made for additional loans, it was very positively stated that all available values on hand by the corporations controlled by the Lavensteins or by them individually, would have to be pledged not only for the new loan but as security for the old loan and I don't recall that there is any deviation from that position. In fact, we were only induced to make the new loan for the reason that we wanted to keep the Lavenstein interests in operation and to obtain security for loans that we already regarded as very weak."

He further said:

"A. The bank requested that all available values owned by the three Lavenstein brothers individually, or their wives, or controlled by them, be pledged as security for what would be due the bank, including old as well as new loans. The signatures of the wives were requested.

"Q. Was it the distinct understanding between you as a representative of the bank and Mr. Moses E. Lavenstein, the representative of the Lavenstein interests, that the collateral pledged with the bank at the time the new loan was made should be held by the bank as collateral security for the entire indebtedness of the Lavenstein interests and not particularly for the new funds loaned?

"Objection by Mr. J. H. Lavenstein: I object to that question on the same grounds that it is a leading question.

"By Mr. Plummer:

"A. It was to be held for security for the old as well as the new loan.

"Q. Was there any understanding or was there any promise on the part of the bank or on your part as the bank's

representative, that any funds realized from any of the collateral pledged at the time the new money was loaned, regardless of to whom that collateral belonged, should be applied in payment of the additional funds loaned at that time? A. There was no such promise."

He tells us conditions under which the $4,000 note was given and taken:

"Q. And this $4,000 note secured by the deed of trust on the Walnut Hill property was to be delivered to the bank as a part of the collateral security for the loan of additional funds in accordance with the understanding that you had with Mr. Moses Lavenstein and to be held as collateral security for the entire indebtedness of the Lavenstein interests, and not particularly with reference to the new funds to be loaned at that time? A. It was delivered as security for the entire indebtedness of the Lavenstein interests with the bank. The note was in the form of a note made by Mrs. A. L. Lavenstein and payable to her order and also endorsed by Moses, H. H. and A. L. Lavenstein. However, the note will speak for itself."

Mr. Everett L. Mann is employed by the receiver of the First National Bank & Trust Company. He said that there had been realized from the sale of Sycamore street property conveyed in trust since the $25,000 loan was made, $21,-917.03, and from the life insurance policy of M. E. Lavenstein $25,908.75, making receipts from these two sources alone $47,825.78.

Mr. Lavenstein said that the bank was "perfectly satisfied" with collateral which it held for old indebtedness. Mr. Plummer said that his bank was dissatisfied and was induced to make the new loan only because in that manner could additional security for the old loan be secured. It is not reasonable to believe that it would have required collateral whose value was about $175,000 to secure a $25,000 loan, and it is still more unreasonable to believe that the Lavensteins would have given up securities so valued for such a loan.

Mr. Plummer says that he was the officer under whose supervision these matters usually passed and that he could not

recall "that anybody else among the officers had authority in the matter." This transaction was one of importance. If he could not recall delegation by him of authority to another, then the probabilities are that it was never made. He is not to be discredited because he is more cautious in his statements than Mr. Lavenstein who undertakes *in ipsissimis verbis* to re-state a telephone conversation seven years old. Moreover, Mr. Lavenstein's evidence is to the effect that Mr. Plummer told him that he could take the matter up with Mr. Franklin. He qualified that statement by saying that he, Plummer, upon his return from Richmond, "would take it up with him." It is reasonable to assume that he intended to take it up with Lavenstein, but if this be not true, and if he intended to say that he would take it up with Franklin, it is still perfectly clear that he reserved to himself final decision. This in itself was sufficient to put Lavenstein on notice that Franklin had no authority to commit the bank to any definite agreement.

The account which Mr. Plummer gives of this transaction appeals to reason. The bank was uncertain about the solvency of its old loans, and it took advantage of the request for a new one to secure additional security. Nor is it reasonable to believe that he would have made, directly or indirectly, a contract against the wishes of his board and which would have, in a measure at least, defeated the purpose which the bank had in mind.

As early as October, 1933, there had already been collected from new collateral more than enough to pay the new loan, and yet it was not until 1938 that Mrs. Lavenstein sought to have her note returned.

The decree appealed from should be affirmed, and it is so ordered.

*Affirmed.*