# Richmond

ALMA McNEIL BREWER v. WILLIAM PHILIP BREWER.

March 10, 1958.

Record No. 4722.

Present, All the Justices.

The opinion states the case.

*Bentley Hite,* for the appellant.

*Alton I. Crowell (Crowell, Deeds & Nuckols; Dillow & Andrews,* on brief), for the appellee.

HUDGINS, C. J., delivered the opinion of the court.

On July 29, 1954, Alma McNeil Brewer filed a bill in chancery against her husband, William Philip Brewer, alleging that in February or the early part of March, 1951, her husband executed and delivered to her a deed, thereby making her and her husband tenants by the entirety, with the right of survivorship as at common law, in a farm consisting of 688¾ acres lying in Giles county; that the deed was not recorded but was accepted and placed by her in a steel filing cabinet in a room where she and her husband kept their business papers; that on January 4, 1954 she looked for the deed and found that it was missing. The prayer of the bill was that William Philip Brewer "be required to re-execute the said deed as above set out, and deliver it to your complainant, or that a Special Commissioner be required to execute and deliver the said deed" to her, and for general relief. In his answer William Philip Brewer denied all the material allegations of the bill.

Upon the pleadings, depositions and argument of counsel, the learned Chancellor entered a decree dismissing the bill and declaring that Alma McNeil Brewer "failed to establish by her proof that the deed alleged in her bill of complaint as having been executed and delivered to her by the defendant, William P. Brewer, was ever so delivered, and she is, therefore, not now entitled to have delivery

thereof or to claim thereunder." From that decree Alma McNeil Brewer obtained this appeal.

William Philip Brewer, hereinafter designated appellee, admits that he executed a deed, conveying a half interest in the farm to his wife, Alma McNeil Brewer, hereinafter designated appellant, but denies that it was ever delivered to her.

The dominant issue is whether appellee delivered to appellant a deed conveying to her an interest in his 688¾ acre farm and, if so, what was the nature and extent of the interest thereby conveyed.

■ The evidence was introduced in the form of depositions and hence the decree of the lower court, while presumed to be correct, is not entitled to the weight usually given by this Court to a decree based on evidence taken *ore tenus*. *Peal* v. *Luther*, 199 Va. 35, 97 S. E. 2d 668; *Klingstein* v. *Eagle*, 193 Va. 350, 68 S. E. 2d 547; *Ashby* v. *Dumouchelle*, 185 Va. 724, 40 S. E. 2d 493; *Porter* v. *Frost*, 183 Va. 549, 32 S. E. 2d 687; *Lavenstein* v. *Plummer*, 179 Va. 469, 19 S. E. 2d 696.

■ Appellant testified that in 1928, while she and her husband were living in West Virginia, Willie Sue Hoge Brewer and John Alfred Brewer, mother and father of appellee, promised that they would give her and her husband 200 acres of the 688¾ acre farm then owned by them in Giles county, provided she and her husband would move on the farm, restock and maintain it; that she and her husband performed their part of the agreement by moving on the farm in 1928, and maintaining it continuously since that time.

For several years after she and appellee moved on the farm, appellant taught school and appellee was employed as a traveling salesman for a tailoring company. Each put his or her separate earnings into the repair of buildings, improving the productivity of the land and buying cattle to restock the farm. Neither intended to charge the other with any part of his or her separate earnings so used. But there was a verbal agreement that when appellee obtained title to the farm, or a part of it, he would convey to appellant a half interest therein.

When, in the fall of 1950, the parties were informed that Willie Sue Hoge Brewer, who had survived her husband, had failed to devise the 200 acres in fee to appellee and appellant, they employed J. Livingston Dillow, an attorney of Pearisburg, Virginia, to represent them in the settlement of the mother's estate. A compromise settlement was made whereby the other beneficiaries of the estate con-

veyed to appellee, by deed dated February 12, 1951 and recorded February 20, 1951, the entire Giles county farm, in consideration of which appellee agreed to pay certain debts owed by the estate, including a mortgage on the farm, and to surrender his interest in all other property of which his mother died seized and possessed.

Appellant further testified that appellee, prior to, during and after the negotiation of the settlement, promised to convey to her a half interest in the farm; that soon after the deed to appellee was recorded, in March or April of 1951, she and her husband employed J. Livingston Dillow to prepare a deed, conveying to her a half interest in the farm; that such a deed was signed by appellee and her, sealed, acknowledged and delivered to her in Dillow's office; that she, in the company of appellee and Dillow, went to the clerk's office of Giles county to have the deed recorded, found it closed and left the deed, without recording fees, with the Commissioner of Revenue, Chapman Hoge, who promised to deliver it to the clerk's office the next morning. She also said that this deed was shortly thereafter received by her in the mail from the clerk; that she then read it, showed it to her colored maid and, thinking it had been recorded, placed it in a filing cabinet to which only she and appellee had access.

In December of 1953 or January of 1954, appellant found that the deed to her was not in the filing cabinet and was not on record in the clerk's office. She immediately took the matter up with her husband, her daughter and Mr. Dillow. On the refusal of her husband to return the deed, or to execute another deed conveying her a half interest in the farm, she instituted this suit.

The evidence upon which appellee relies to rebut appellant's proof of delivery of the deed may be summarized as follows: Appellee testified that the relations between him and his wife had become very disagreeable and strained prior to, and early in, 1951; that on different occasions she had threatened to leave him, have him declared mentally incompetent and confined to a mental institution; that relying upon her promise to mend her ways and to treat him as a wife should treat a husband, he promised to convey to her an undivided one half interest in the farm; that pursuant to this agreement he employed J. Livingston Dillow to prepare such a deed, which he signed and acknowledged in Dillow's office; that he instructed Dillow to keep the deed, as he did not intend to deliver it until he knew that his wife would fulfill her promises. Although he told his wife and several other people that he had made a deed conveying appellant an

interest in the farm, he denied that he ever delivered the deed to her or authorized his attorney to do so.

Appellee further testified that for a short period of time after he informed his wife he had "made" a deed conveying her a one half interest in the farm, her treatment of him improved. But later, contrary to their understanding, she attempted to sell part of the land to several different persons and began to criticize and "nag" him as she had done before. This failure of appellant to fulfill her promises caused appellee to change his mind about delivering the deed to her. In the fall of 1953, with the intention of destroying the deed, appellee went to Dillow's office and finding him out of town requested Chapman Hoge to examine the books in the clerk's office to see whether the deed in question had been recorded. On finding that it had not been recorded he requested Hoge to say nothing about his inquiry.

A few weeks thereafter, on Thanksgiving Day of 1953, appellee left his home for a visit to his only child, Anne Brewer Mendez, in Venezuela, South America, where he remained until June of 1954. Appellee introduced as exhibits with his testimony several letters written by appellant and their daughter to each other while he was in South America. This correspondence shows, among other things, that on or about January 4, 1954, appellant ascertained that the deed had disappeared from the cabinet where she claims she kept it, and that it was not recorded. It also shows the attitude of the parties toward each other, and that appellee and his daughter had discussed in some detail the contents of the deed and how they desired to have it changed.

In addition to his own testimony, appellee relies primarily on the testimony of his attorney, J. Livingston Dillow, to corroborate his own testimony that there was no delivery of the deed in question. While Dillow's testimony is corroborative in some respects of the testimony of appellee, on the whole it is inconsistent and unconvincing.

Dillow's depositions were taken on three different occasions. On March 4, 1955, he was called as an adverse witness and said that some time after obtaining for appellee a deed to the Giles county farm, he, at the direction of appellee, prepared a deed which was acknowledged by appellee before him as a notary public, conveying to appellant a one half interest in the farm; that appellee "directed me at the time to keep that deed, preserve that deed for him, and that he

would advise me what he wanted to do with it. *I filed that deed away in his file in my office, in a steel filing cabinet, and as I say, in his personal file. That deed remained in that file until he returned from a visit to South America,* which I suppose must have been in 1954. I am sure it was. He told me at the time that he had not made up his mind definitely what he wanted to do. He wrote me from South America concerning the deed. I replied to him and told him he could see me when he returned to the States. When he returned home, sometime after his return home, he came to my office, * * * and requested me to procure the deed from my file. *I procured the deed from my file.* The deed was examined by my law partner, C. B. Andrews, who of course, likewise, knows that the deed was signed by Mr. W. P. Brewer and the acknowledgement taken by me as a notary public, because he personally examined the deed, and after some discussion in my office on the question, *on that occasion,* W. P. Brewer requested that the deed be destroyed. The deed consequently was then and there, in my presence and in my office, and at the express direction of Mr. W. P. Brewer destroyed."

When asked why appellant wanted one half of the farm in her name, Dillow said: "I assume the same reason your wife and my wife do. *They lived there together and operated the farm together, and as far as I know for all the years past got along beautifully together.*"

The italics in the above quoted testimony of Dillow are added for the purpose of emphasizing the inconsistency of other parts of his testimony, hereinafter quoted and italicized.

On February 6, 1956, approximately eleven months after he had testified as an adverse witness, Dillow's deposition was taken as a witness for appellee, his client. On that occasion he testified that in January of 1954, on receipt of a letter from appellee, he showed the deed in question to his law partner, Andrews, who "examined the deed, *and I thereupon locked the deed up in my private desk.* It remained there until Mr. Brewer returned from Venezuela and on a visit which he made to my office, *I again removed the deed from the desk,*" and destroyed it as he previously testified when called as an adverse witness. He further testified on this occasion, when asked about appellee's health and mental condition at the time the deed was prepared, as follows:

"He [appellee] was in a pretty bad state of health for a long time. His condition indicated that he was worrying and under a lot of tension and nervous condition. He was mentally sound but he was

under a terrific nervous strain. *They were having a lot of difficulty and Mrs. Brewer was, apparently, determined to give him all the trouble that she could,* but I can state positively, and do testify positively, that there was never any delivery of that deed. It was destroyed at the personal direction of Mr. W. P. Brewer by me."

On March 14, 1956, Dillow testified on cross examination by Bentley Hite, attorney for appellant, as follows:

"Q. Mr. Dillow, do you remember when Mrs. Brewer and I came to your office and talked with you about this matter sometime in the summer of 1954?

"A. With regard to what, Mr. Hite?

"Q. With regard to this deed, mainly and primarily in regard to this deed in question.

"A. I think you folks came and talked to me about it. Don't remember any of the details about it.

"Q. You remember it was shortly, or sometime after Mr. Brewer had returned from South America, in '54?

"A. I have no independent recollection about it, Mr. Hite. I do recall you folks came to see me about it, but when it was I don't know.

"Q. We think it was sometime along the first or second week in July, 1954. I know it was shortly after the fourth of July.

"A. It may have been.

"Q. Do you remember talking to us?

"A. I remember talking to you and Mrs. Brewer, yes.

"Q. And you remember telling us you had prepared a deed for the Brewers?

"A. I do not remember what we talked about, but you probably did ask me about that. We may have discussed that. No doubt we did, because it was a fact that I had prepared the deed.

"Q. Do you remember anything specifically about the conversation that we had that day?

"A. No, sir, I could not point out to you anything specific about it. * * *

"Q. When we asked you what had been done with the deed, what became of it, didn't you say you didn't know, that the only thing you knew about it was when you handed it to them?

"A. Which deed?

"Q. From William Philip Brewer to his wife?

"A. I do not recall telling you anything of that nature. That deed never left my office, as I already testified.

"Q. Did you tell Mrs. Brewer that day that deed was in your office?

"A. No.

"Q. Did you give me any information that that deed had not been delivered?

"A. I do not recall what we discussed on that occasion, and I am not going to attempt to tell you what the discussion was because I do not recall. You were apparently anxious to get the facts in this matter. I am not going to say what I said on that occasion."

In his testimony when called as an adverse witness on March 4, 1955, Dillow testified as to when he began representing appellee in this case, as follows: "* * * Mr. C. B. Andrews and myself, Dillow and Andrews, were associated with the law firm of Crowell, Deeds and Nuckols, Pulaski, sometime after this suit was instituted. That is correct. Mr. Crowell came to see us and we agreed to become associated with that firm in Mr. Brewer's behalf.

"Q. Do you remember just when that was?

"A. No, I could not, except to say that it was sometime between the time the Bill of Complaint and Process were served on Mr. Brewer and the time the defendant's pleadings were filed."

Thereafter, on March 14, 1956, Dillow also testified:

"Q. * * * Between the 6th and the 12th of July 1954, didn't you tell me [Mr. Hite] and Mrs. Brewer that you could not represent her in this matter, could not represent either party in this matter because you had been attorney of both parties and hoped you were still friends of both parties, and didn't want to get involved, but you would assist me in bringing about a peaceful settlement of this affair?

"A. I was hoping, Mr. Hite, from the very beginning to bring about a peaceful settlement of this affair.

"Q. Didn't you tell me that?

"A. I may have, Mr. Hite.

"Q. Didn't you say you would write her daughter in Venezuela?

"A. I did just that. I wrote her daughter in Venezuela.

"Q. You admit that, and you wrote her shortly saying you were trying to affect a settlement of this affair?

"A. I did just that, but I didn't get a reply to my letter. Nothing came of that letter."

Appellant introduced in evidence a receipt signed by Dillow's secretary showing that on September 7, 1954, she paid the firm of Dillow

and Andrews $20.00. She testified, and it is not denied, that this was a fee paid for a consultation about the deed in controversy.

It further appears from the evidence that on January 14, 1954, while appellee was in South America and after appellant had first written her daughter that her deed was missing, appellee wrote Dillow a letter in which he said: "My reason for this letter is this, before I left the States I asked you to look after my interests there should any thing come up. Now, the last time I was in your office you were very busy and I didn't bother you with a small paper I had Mr. Andrews fix up for me. However, it now appears that something has come up, so I am depending on you. * * * Will you please advise me if I am correct in depending on you?"

Dillow answered this letter on January 22, 1954, stating that, "Most assuredly we will be in a position to represent your interests and this we are already trying to do. I think I will have some pleasant information for you by the time you return home." In explaining this correspondence between himself and appellee, Dillow testified:

"A. Whatever he [appellee] was talking about. I was talking about the deed, and I assumed he was.

"Q. On January 22 you said you had pleasant news for him?

"A. Yes, and I apparently had reference to the fact the deed was in my files.

"Q. You didn't say so.

"A. I didn't say so but I am quite sure that is what I had in mind.

"Q. What did you have reference to? Did you mean it was there and he didn't know it was there?

"A. I don't know whether he knew it was there or not.

"Q. Why would it be a pleasant surprise to him?

"A. Mrs. Brewer had been insisting about this deed all this time. I couldn't tell you whether he knew this deed was in my files. I found the deed in my files. Showed the deed to Mr. Andrews. That is what I had reference to when I wrote this letter."

Appellant's attorney, Bentley Hite of Christiansburg, Virginia, testified that shortly after the fourth of July, 1954, and before this suit was instituted, he and appellant went to Dillow's office for the purpose of obtaining information about the deed. His testimony as to what took place during this interview in Dillow's office is as follows:

"I recall distinctly coming to Mr. Dillow's office, and recall talking with him and Mrs. Brewer, and I told him why I had come, and he

was very affable as always, and said he was glad we came over, and he explained to us and said Mr. and Mrs. Brewer had been his friends for years, and he had worked for them, and told us about getting a deed from the Brewer heirs to Mr. Brewer to the property in this county, which had been sometime in '50 or '51, and said yes there was a deed executed. And at that point I told him I wanted to know whether there was a deed from Mr. Brewer to Mrs. Brewer, and he said yes a deed was executed. They had talked to him several times and he had prepared a survivorship deed. And I said that Mrs. Brewer thought she had a deed for a one-half interest, and he said, 'No, you remember we talked with Chapman Hoge and we thought it best to prepare a survivorship deed.' And she insisted that it was a half interest in the property, not a survivorship deed, and we discussed it in general there in the conversation, and I said, 'Well, where is that deed now? It is not on record. Where is it?' And he said, 'I don't know. I had no interest in it after I handed it to them.' The word 'handed' stuck in my mind in some way, but he said 'handed it to them.' I said, 'Who acknowledged it?' He said, 'Bob Woods did most of my notarial work at that time. You might go see him.' And I said, 'That is good.' And I said, 'Are you sure it was a survivorship deed and not for a one-half interest?' And he said, 'I am sure.' And when we stood up to go he patted Mrs. Brewer on the back and said, 'I am glad you came over. Glad to do anything I can for either of you, but as I told you before I cannot represent either of you since I have represented you in matters before. But I will write Ann [daughter of the parties] and see if she can help bring this to a peaceful conclusion.' "

Hite, on cross examination, said:

"My statements to him [Dillow] were so clear nobody could have misunderstood. I came here for the sole purpose of determining from Mr. Dillow whether a deed had been executed, and in the evidence there he thought he delivered a deed to this property from Mr. Brewer to Mrs. Brewer. He stated that emphatically, and I would not have brought the suit had I been told otherwise."

Appellant, who was present during the conversation between the attorneys, Hite and Dillow, corroborates the testimony of Hite. Evidently, when Hite, as attorney for appellant, drafted the bill of complaint he relied on the alleged statement of Dillow to him that the deed Dillow prepared was a survivorship deed. However, the uncontradicted evidence is that the deed prepared by Dillow and

executed by appellee conveyed to appellant a one half undivided interest in the Giles county farm.

It appears that Dillow agreed to represent appellee in January of 1954, and according to Hite and appellant he told them early in July of 1954 that he was not in a position to represent either party. He testified that he was employed just before the answer to the bill was filed on August 20, 1954. Thereafter, in September of 1954, his firm accepted compensation from appellant for a consultation about the deed in question. While the deed was in his possession and before he claimed he destroyed it at the request of appellee, he stated, according to Hite, that he had prepared a survivorship deed and "handed" it to the parties. He could not "recall" or "remember" with any degree of certainty what was said at the very important conference with appellant and her attorney in July of 1954, but he did remember "positively" what occurred when he prepared the deed in 1951. Furthermore, appellee does not in his testimony corroborate the testimony of Dillow that he directed him to destroy the deed. Indeed, appellee did not testify that he was even present when Dillow said the deed was destroyed.

C. B. Andrews, law partner of Dillow, testified that in January of 1954 Dillow showed him a letter from appellee and at that time "he showed me a deed which was made by W. P. Brewer to W. P. Brewer and Alma Brewer and was signed by W. P. Brewer and acknowledged by J. L. Dillow. As I recall, Mr. Dillow answered Mr. Brewer's letter and later on that day he locked the deed up in his desk and I haven't seen the deed since then."

Chapman Hoge testified that sometime in 1951 appellant and appellee came by his office and left a deed with him with the request that he deliver it to the clerk the next morning for recordation, which he did, but he did not read the deed and did not know what it contained. He further testified that: "As far as I know they got along as well as the usual married couple do. All have some disagreements I guess." He also said that in 1953 appellee asked him to go in the clerk's office and ascertain whether a deed from him to appellant had been recorded; that he examined the books in the clerk's office and found no such deed recorded; that thereupon appellee asked him to "say nothing about it."

Appellant's testimony is also corroborated by the testimony of three witnesses, two of whom stated they saw and read a deed from

appellee conveying a one half interest in the farm to appellant. The testimony of these witnesses may be summarized as follows:

Margaret Thelma Wray testified that she was a close friend of the parties, visited in their home at least once a week for three years from 1950 to 1953, and often stayed in their home over the week-ends. She said that while she was visiting in the Brewer home in the spring of 1951, appellant showed her a deed which conveyed a one half interest in the farm from appellee to appellant; that she read the deed and noticed that it had not been recorded. She also testified that appellee told her on several occasions that his parents had promised him and appellant 200 acres of the farm; that he intended to give appellant one half of the farm, and that a few days after she had read the deed, while she and appellee were taking the maid home, he told her he had given appellant a deed to one half of the farm.

William Edgar McNeil, brother of appellant, who lived on the farm with the parties for about three years beginning in 1951, testified that appellee told him that he had given appellant one half of the farm and that they had discussed it on several occasions. He further testified: "I had a little house outside theirs. This night he [appellee] come out, passed some remark about the deed. It aroused my suspicions about the deed, so in a day or two I told her to get the deed and let me look at it to see if there was anything wrong about it, because he dropped something about the deed that aroused my suspicions. The first thing I noticed was the cheap grade of paper. It was a very short deed, being a plain straight deed for one-half of the farm for value received."

The colored maid, Lillian Chapman, who worked for the parties for seven years prior to 1953, said, when asked if she knew anything about a deed to appellant, that: "Onlyest thing I know about that, one day Mrs. Brewer came in and she said, 'Lillian, this is the deed to the farm, and I am deeded the half of it,' but I did not see what was inside. She said, 'This is the deed to the farm. I am deeded half of it. I am going to put it in this cabinet. If something happens to us I am showing you where I put it so you can tell people.' It was a blue paper."

In *Payne* v. *Payne*, 128 Va. 33, 44, 104 S. E. 712, after an extensive and comprehensive review of numerous authorities dealing with the subject of delivery of deeds, Judge Prentis said:

"In close and doubtful cases, this question has given rise to much litigation, and while the principles involved have been stated many

times, their application to concrete cases is extremely difficult. There was a delivery if there was the intention to deliver which is effectuated by words or acts, and this is a question of fact to be gathered from all of the circumstances of the particular case."

"Delivery is, of course, essential to the validity of a deed. The delivery may be actual, as by manual tradition to the grantee, or to another for his use, or it may be constructive as where it is placed in the power and control of the grantee. It may be proved by direct evidence or be inferred from circumstances." *Enright* v. *Bannister*, 195 Va. 76, 79, 77 S. E. 2d 377; *Crump* v. *Gilliam*, 190 Va. 935, 59 S. E. 2d 72.

If the deed was delivered to appellant by appellee, or with his consent, title passed and, as between them, is not affected by the fact that the deed was not recorded or was afterwards lost or destroyed. *Garrett* v. *Andis*, 159 Va. 150, 165 S. E. 657; *Ferguson* v. *Bond*, 39 W. Va. 561, 20 S. E. 591.

"Where the deed is one of gift and not of bargain and sale, and is made pursuant to an antecedent promise or agreement, some evidence of delivery is still necessary, but it need not be conclusive." *Garrett* v. *Andis, supra,* 159 Va., at page 158. This principle was restated in *Enright* v. *Bannister, supra,* 195 Va., at page 80, where the court said:

"It is generally agreed, however, that the law makes stronger presumptions in favor of delivery where a deed is a voluntary settlement than in an ordinary case of bargain and sale. 16 Am. Jur., Deeds, § 151, p. 522; 26 C. J. S., Deeds, § 183 at p. 592; Anno. 129 A. L. R. 11 at p. 40; *Payne* v. *Payne*, 128 Va. 33, 45, 104 S. E. at p. 712, 716; *Mumpower* v. *Castle, supra,* 128 Va. at p. 17, 104 S. E. at p. 711. But even in such cases some evidence of delivery cannot be wholly dispensed with. *Garrett* v. *Andis*, 159 Va. 150, 158, 165 S. E. 657, 659."

In determining whether there has been delivery of a deed of gift or voluntary settlement the courts will generally consider as potent factors, in connection with all the circumstances, the fact that the grantor stands in the relation of spouse or parent to the grantee, and has made statements to the effect that he intended to, and did, execute such a deed. 129 A. L. R. 11, Anno.—Deed-Delivery Without Manual Transfer, at pages 25, 27.

Our study of the evidence, in the light of these principles, convinces us that appellee not only executed a deed conveying a one

half undivided interest in the farm to appellant, but that he intended to and did deliver, or caused to be delivered, such a deed to her.

In so holding we do not decide the liability of the parties as to outstanding debts, or their rights in personal property on the farm, as these are not in issue. Furthermore, the record is replete with charges and counter charges bearing on the domestic relations of the parties; but since these charges are pertinent in the suit for separate maintenance and divorce now pending between the parties, nothing said herein is intended as an expression of opinion on the merits of such charges.

Before finally disposing of the case we feel compelled to say that it appears from the record that J. Livingston Dillow and C. B. Andrews, attorneys for appellee, and Bentley Hite, attorney for appellant, were witnesses in the case for their respective clients and were counsel of record both in the trial court and in this Court. We admonish them to observe more carefully the Canons of Professional Ethics. 172 Va. xvii.

For the reasons stated the decree is reversed and the case remanded with directions to the lower court to enter the necessary orders or decrees transferring to appellant a one half undivided interest in the 688¾ acre Giles county farm.

*Reversed and remanded.*