## Richmond

### HENRY F. CAPOZZELLA v. HARRIET A. CAPOZZELLA.

April 23, 1973.

Record No. 8071.

Present, All the Justices.

*Blair D. Howard* (*Howard, Stevens, Lynch, Cake & Howard*, on brief), for appellant.

*Roy A. Swayze*, for appellee.

POFF, J., delivered the opinion of the court.

This is an appeal from a final decree entered on December 20, 1971 granting the prayer of a bill of complaint filed by Harriet A. Capozzella against Lytton H. Gibson and Henry F. Capozzella for a mandatory injunction directing Gibson, as stakeholder, to deliver to the clerk for recordation a deed from Donald K. Graham and Rothwell J. Lillard, Trustees, to Henry F. Capozzella and Harriet A. Capozzella, his wife, as tenants by the entirety, conveying 51 acres of land with residence in Fairfax County. The deed was duly delivered and recorded, and we granted Henry F. Capozzella an appeal.

Pursuant to a separation agreement dated March 20, 1968, and for the purpose of waiving inchoate dower rights, Henry F. Capozzella and his first wife, Bette, executed a deed dated May 3, 1968 conveying the property to Capozzella's attorneys, Donald K. Graham and Rothwell J. Lillard, as trustees, with the understanding that upon payment of a sum of money to Bette the trustees would be empowered to convey title according to Capozzella's instructions. Payment was made in due course.

Harriet Capozzella testified that some time prior to their marriage, Henry F. Capozzella took her to the office of attorney Lytton Gibson and told Gibson, "I want to get my property out of the names of the trustees and put in this little girl's name, because if it weren't for her, I would be dead today." She explained that Capozzella was referring to help she had given him in obtaining employment as chief anesthetist at a large hospital. On June 19, 1970, four days after their marriage, the couple visited Gibson again, and Capozzella told the attorney that "[t]here is no reason not to take the trustees' names off, and have my wife's put on".

From Gibson's testimony concerning that meeting, it appears that Capozzella was eager to do whatever was necessary to prevent his first wife from attacking his will, and through their minor daughter, acquiring control over his property. Capozzella told Gibson that he trusted his new wife, and Gibson advised him that they should execute mutual wills and have the trustees convey the property to him and his new wife as tenants by the entirety with right of survivorship as at common law. Gibson explained the nature and effect of the tenancy "in detail".

By letter dated June 22, 1970 Gibson wrote to Lillard inquiring if the trustees were prepared to execute a deed. By letter dated June 25, 1970 Lillard advised Gibson in the affirmative, asked for written instructions from Capozzella and suggested a fee of $25.00 for each of the trustees.

On June 30, 1970 Gibson wrote to Capozzella telling him that the trustees had agreed to execute a deed, that the trustees' fees would be $25.00 each and that Capozzella should advise him the balance due on the trust note secured by the property in order that he could make appropriate provision in the deed he was preparing and properly calculate the recording fees.

Harriet testified that Capozzella telephoned her while she was in Massachusetts packing her effects to move to Virginia and asked her

to call Gibson and give him the information requested in the letter, which, as Gibson confirmed, she did.

In late August 1970, she and her husband visited Gibson again and signed some document which she could not identify but which Gibson said he would send along with the deed to the trustees. Lillard testified that he never received written instruction signed by Capozzella but felt that Gibson had full authority to speak for him. Gibson testified that he estimated the costs of recordation of the deed would be about $1300.00 and "suggested that the parties just wait and see if the property was sold" and that Capozzella "agreed the deed was not to be recorded on account of the cost."

Dr. Alexander, Harriet's father, testified that at breakfast on the morning following the August meeting Capozzella told him and Mrs. Alexander "that they went and saw Mr. Gibson, and that he had the names of the trustees on the deed taken off, Lillard and Graham, and asked Mr. Gibson to have Harriet's name on the deed, and he was very happy to do that because that was the best gift he could give to her." Mrs. Alexander testified that Capozzella said, "Dr. Alexander, I want you to know that after we went in to see Mr. Gibson, and we signed the papers for the deed, I gave Harriet one-half of my property as a gift to her."

In a letter dated October 7, 1970 to Lillard, Gibson enclosed two $25.00 checks and a general warranty deed of tenancy by the entirety. At Lillard's request, Gibson re-drafted the deed to provide special warranty of title, dated it October 15, 1970 and sent it to Lillard.

By letter dated November 6, 1970 Gibson advised Capozzella that he had prepared the wills and received the executed deed from the trustees. He asked Capozzella to make an appointment to inspect the wills and "determine just what we want to do about recording the deed". Five days later the Capozzellas separated, the appointment was never made, and the wills were never signed. On account of the domestic dispute, Gibson retained the deed pending a court order. By letter dated December 11, 1970 Gibson submitted and Capozzella paid a bill of $350.00 for legal services rendered from April 13, 1970 to November 6, 1970 and "advanced costs" of $50.00.

Capozzella argues that the deed was void because he had given Gibson no instructions as to disposition of the deed and there was, therefore, no completed delivery of the deed; that the deed was void because Gibson, acting without his authority under seal, had no power

to bind him to a deed under seal; and that the deed was void because the trustees, acting without his written authorization, violated their fiduciary duty in executing the deed.

For a deed to pass title, there must be delivery. For delivery to be operative, physical deposit with the named grantee is not essential.

"The delivery may be actual, as by manual tradition to the grantee, or to another for his use, or it may be constructive . . . . It may be proved by direct evidence or be inferred from circumstances." *Enright* v. *Bannister*, 195 Va. 76, 79, 77 S.E.2d 377, 379 (1953).

See also *Schreckhise* v. *Wiseman*, 102 Va. 9, 45 S.E. 745 (1903), approving the rule that delivery may be effective when a deed is deposited with a third person for transmittal to the grantee.

If delivery is made, recordation is not necessary to pass title. Even if the deed is lost or purposely destroyed by the grantor, delivery passes title. *Brewer* v. *Brewer*, 199 Va. 753, 102 S.E.2d 303 (1958); *Garrett* v. *Andis*, 159 Va. 150, 165 S.E. 657 (1932). And where the deed is made by one spouse to another in voluntary settlement of an antecedent promise, the formalities of delivery required of deeds of bargain and sale are not necessary. *Garrett* v. *Andis, supra*, 18 C. J. *Deeds* § 96, at 201 (1919); 23 Am. Jur.2d *Deeds* § 111, at 160 (1965); 26 C. J. S. *Deeds* § 7(c), at 592 (1956).

What makes delivery operative is the grantor's intent.

"There was a delivery if there was the intention to deliver which is effectuated by words or acts, and this is a question of fact to be gathered from all of the circumstances of the particular case." *Payne* v. *Payne*, 128 Va. 33, 44, 104 S.E. 712, 716 (1920).

Capozzella contends that he did not intend to deliver and delivery was incomplete because he had not given Gibson "specific instructions as to the disposition of the deed". As a corollary, relying upon *Forrest* v. *Hawkins*, 169 Va. 470, 194 S.E. 721 (1938), he argues that authority of an agent to bind his principal to a sealed instrument must be under seal. We consider the latter argument first.

In *Forrest*, the attorney executed a sealed instrument intended to bind his client. Here, Gibson was merely a conduit through which Capozzella's wishes were transported. The sealed instrument was ex-

ecuted by the trustees under sealed authority given them in the deed of May 3, 1968, signed and sealed by Capozzella.

As to the former argument, we believe delivery was complete.

On the question of intent, the evidence is uncontradicted that Capozzella intended to remove title from the names of the trustees. If he intended the deed to be operative for one purpose, he must be taken to have intended it to be operative for all purposes apparent on its face.

Not once, until separated from his new wife, did he deny that he intended her to share ownership of his home. Prior to the marriage, he told Gibson that he wanted to put the property in her name. Only a few days after the marriage, he reaffirmed that purpose, and when Gibson advised how the deed should be drawn, his words and conduct justified Gibson in believing that he had full authority to pursue the course he recommended. A scant two weeks later, after receiving Gibson's letter telling him that the trustees were ready to execute the deed, Capozzella called his wife and asked her to supply the information necessary for Gibson to draft it, something he would not have done had he objected to its purpose.

When the couple returned to Gibson's office in August, Capozzella had another opportunity to protest what he knew Gibson was doing. Not only did he fail to challenge Gibson's authority, he accepted Gibson's further suggestion that he hold the deed and save recording costs until a decision had been reached about a possible sale. The following morning at breakfast, Capozzella told his wife's father that Gibson had made arrangements to effectuate the gift he was making her.

Even after receipt of Gibson's letter telling him that the executed deed was in his hands, Capozzella did not question Gibson's authority or repudiate what he had done. Rather, he paid Gibson for legal services rendered and reimbursed him for trustees' fees advanced.

When the deed, drafted and executed as Capozzella intended, was delivered to Gibson as Capozzella intended, there was an "intention to deliver . . . effectuated by words or acts" and therefore a "delivery" within the meaning of the rule in *Payne*. From the circumstances of this case, the chancellor decided the question of fact and found that delivery was complete. The evidence supports his finding. Upon delivery, title passed from the trustees to the Capozzellas. The fact that Henry F. Capozzella gave Gibson no instructions as to what he should do with the deed after delivery does not negate his intention to transfer title by such delivery.

We find no merit in Capozzella's argument that the trustees violated their fiduciary duty by acting without his written authority. Both trustees were Capozzella's attorneys in his first divorce case. Their authority to execute their deed was written into the deed Capozzella and his first wife made to them pursuant to the separation agreement. Both of these documents were signed by Capozzella. Neither required the trustees to await written instructions. Oral instructions, transmitted through Gibson by the sole beneficiary of the trust, were sufficient to justify the exercise of their fiduciary responsibility.

Finding no error, we affirm the chancellor's decree.

*Affirmed.*

HARRISON, J., dissenting.

I dissent for the reason that appellee failed to carry the burden of proof which rested upon her "to show every fact and circumstance necessary to constitute a valid gift by clear and convincing evidence". *Rust v. Phillips*, 208 Va. 573, 578, 159 S. E. 2d 628, 631 (1968). The record discloses neither intent nor delivery.

We are concerned here with property having an estimated value in excess of $1 million. The marriage between Dr. Henry F. Capozzella and Harriet A. Capozzella on June 15, 1970 was his second and her third. It lasted less than five months. Harriet claims that four days after their marriage Capozzella "because of his great love for her" made to her "a valid gift of the land" involved. She alleges that this gift was effectuated by the preparation of a deed, its execution by the trustees and its delivery to Lytton H. Gibson, who was, as she characterized him, the attorney for Capozzella.

Appellee supports her case by the testimony of her mother and father. Capozzella denies the gift and introduces the testimony of his two sisters. We must look to Gibson for an impartial version of the facts.

Capozzella did discuss with Gibson on June 19, 1970, in the presence of Harriet, the taking of title to the property in their joint names. However, it appears that he was then primarily concerned with the possibility that through his children, particularly his young daughter, his first wife might be able to exercise some control over his property. Gibson testified that at this time Capozzella "didn't know what to do" about his property; that he "wasn't given any instructions by Capozzella"; and that the suggestion that mutual wills be executed and the

deed to the property taken in their joint names with right of survivorship "was done really the way I more or less dictated it". Gibson quoted the doctor as saying "well, I just don't know . . . you do the way you think it ought to be done".

Gibson testified repeatedly that the proposal to place the property in the joint names of Dr. and Mrs. Capozzella was his sole suggestion, and in the answer he filed as a defendant in the court below he stated: "The preparation of the deed in question by this defendant [Gibson] and the manner of taking title was done at the sole discretion of this defendant [Gibson]." Pertinent to the intent of Capozzella was this question to Gibson and his answer:

"Q. Did there ever come a time when he unequivocally expressed to you his intention with regard to this property as to the passage of title, exclusion and recordation?

"A. No, not ever as limited as you put the question. His idea about the property the first time he came in was he thought he would sell it at the best possible price. I don't believe he ever indicated what he wanted to do short of selling it eventually."

Gibson was asked: "Did Dr. Capozzella ever tell you he wanted to make a gift of half of all the property to his wife?" He answered: "Oh, no, he never discussed gifts in any way." The attorney was questioned regarding the effect of a tenancy by the entireties: "So if he died she would have this piece of property?" He answered: "I don't know if he had that in mind clearly or not. As I say, this joint survivorship, that was my suggestion and the primary reason behind it was because he didn't know what to do about his children." Gibson said that he advised Capozzella what he could do *if* he wanted to eliminate his children completely from any possibility of control over the property.

Following his conference with Capozzella on June 19, 1970 Gibson wrote to the trustees who were holding title to Capozzella's land and asked if they would convey the property to Capozzella. The trustees replied that they would execute a deed conveying the land *as Capozzella instructed in writing*. No such instructions in writing were ever given by Capozzella either to Gibson or to the trustees. While there were telephone calls and some correspondence between Gibson and the trustees, and Gibson prepared the deed, there was never a formal written request of the trustees by Gibson, made on behalf of and as attorney and agent for Capozzella, directing and authorizing the trustees to convey title to Capozzella and Harriet.

Gibson's testimony can be characterized as vague, uncertain and indefinite. Most assuredly it is not testimony upon which a transfer of title to real estate should be based. Standing alone, or taken in connection with other evidence in the record, it does not constitute "the clear and convincing evidence" of donative intent this court has consistently held essential to a valid gift. *King, Ex'x v. Merryman, Adm'x,* 196 Va. 844, 86 S. E. 2d 141 (1955); *Nelson v. Liggan,* 189 Va. 637, 53 S. E. 2d 798 (1949); *Grace v. Virginia Trust Co.,* 150 Va. 56, 142 S. E. 378 (1928); *Rust v. Phillips, supra.*

It is significant that notwithstanding Capozzella is alleged to have made this gift on June 19, 1970 the deed from the trustees was not signed until October 19, 1970 (three weeks before the parties separated) and Gibson did not seek further instructions from Capozzella until his letter of November 6, 1970. Gibson's explanation of this June-to-October delay has a definite bearing on the intent of Capozzella to make the gift to his wife. Gibson said: "Very frankly I was dragging my feet. I wondered about this entire marriage, the marriage set-up, etc." He said he was getting calls from New York and Boston, from Harriet, from her father and also from others. He "was wondering what the situation was" and "noticed some friction between the two of them". He said he "got kind of leery of this thing and I didn't know what to do".

We are not concerned here with the friction that developed between Dr. and Mrs. Capozzella which caused the dissolution of their union. Suffice it to say that by late-summer 1970 it existed, and Capozzella had abandoned any intent he ever entertained of taking title to his property jointly with Harriet. As the doctor's ardor waned, Harriet's interest in the property apparently increased. By December 11th Gibson realized that he was "in the middle". After the marriage fractured there was no reason for Capozzella to make a gift of the property to his wife or to deliver the deed, and he had no intention of doing so. Harriet was demanding that the deed be recorded or delivered to her. Obviously Gibson could not comply with her request, for he was Capozzella's attorney, dealing with Capozzella's trustees and Capozzella's land. He realized that there could be no delivery or recordation of the deed unless and until such was directed by Capozzella and that such direction would not be forthcoming. Gibson then retired from the scene.

Even if we could assume an intent on Capozzella's part to make this purported gift to his wife, that intention must be accompanied by

complete and unconditional delivery, actual or constructive. Here a deed had been signed by trustees and deposited with the donor's attorney. No delivery has ever been made to the alleged donee, her attorney or her agent. The donor, Capozzella, never surrendered control or dominion over the deed of his property.

Delivery need not be made to a donee personally; it may be made to a third person acting as agent for the donee. 38 Am. Jur. 2d, *Gifts*, § 20. But "where the instrument relied upon to support a gift inter vivos is not delivered directly to the donee but is given to some third person . . . whether there was sufficient delivery of the instrument turns upon the decision whether the person taking delivery is to be regarded as the agent of the donor or of the donee". 48 A. L. R. 2d 1419; *see* 9 M.J., *Gifts*, § 16. Stated another way, "while delivery may be made *by* an agent of the donor, delivery *to* such an agent is not enough". 38 Am. Jur. 2d, *Gifts*, § 28 (Emphasis supplied). And "[w]hether the third person is the agent of the donor or the agent . . . for the donee turns on the intent of the donor. . . ." *Payne* v. *Tobacco Trading Corp.*, 179 Va. 156, 167-68, 18 S. E. 2d 281, 286 (1942).

Gibson was Capozzella's attorney and so regarded himself. He represented Capozzella in 1969 when the doctor divorced his first wife and settlement was effected with her. He was representing Capozzella when the doctor married Harriet. In her bill of complaint Harriet alleges that Gibson was Capozzella's attorney. The trial judge in his opinion referred to Gibson as Capozzella's attorney. Gibson so represented himself to the trustees, Graham and Lillard. All of Gibson's correspondence was to Capozzella, none to Harriet. It was Capozzella to whom he sent his bill for services. Harriet, when asked if Gibson billed her for services, responded: "He had no reason to. Everything I called him for was for the doctor, himself." She was then asked: ". . . and you never paid him?" She responded: "Well, I had no reason to." There is not a scintilla of evidence in the record that Gibson was the attorney or agent for any person other than Dr. Capozzella.

Aside from the questioned legality of the conveyance by the trustees, in which Capozzella did not unite and which was made without his written authorization, the only possible justification for the conveyance is that the trustees thought that they were conveying pursuant to the direction of Capozzella's attorney. Most certainly they would not have made the conveyance upon the representation of Harriet or her attorney, for she had no interest in or title to the property.

Since Gibson was the agent of Capozzella, execution of the deed

and its delivery to Gibson are not sufficient "words or acts" which "effectuate" the donor's intent to deliver as required by *Payne* v. *Payne*, 128 Va. 33, 104 S. E. 712 (1920), and it cannot be held, as the majority does, that "at that point, delivery was complete".

Viewing the evidence in the light most favorable to Harriet, we have here a case where a man expressed a desire to convey an interest in land to his wife but before the transaction could be consummated by delivery of the deed the parties separate, and he changes his mind. This was Capozzella's prerogative, for the trustees were his trustees; the property involved was his land; the attorney who requested execution of the deed and to whom the deed was delivered was his attorney. The deed was at all times under the control of Capozzella, and remains so to this date.

It is well-settled that "gifts . . . must be fully and completely executed—that is, there must be a donative intent to transfer title to the property, a delivery by the donor, and an acceptance by the donee". 38 Am. Jur. 2d, *Gifts*, § 18. Delivery of the thing purported to have been given, even if legally sufficient in all other respects, will not make the gift effective if the grantor did not intend to make the gift. Conversely, "an intention to give, unaccompanied by a delivery, is ineffectual to constitute a gift". *Snidow* v. *First National Bank*, 178 Va. 239, 249, 16 S. E. 2d 385, 388 (1941). The intention must be executed by a complete and unconditional delivery. *Thomas* v. *Lewis*, 89 Va. 1, 15 S. E. 389 (1892).

It is equally well-settled that delivery may not be actual, but constructive, and "[t]he intention to give, manifested by the words or acts of the donor, is often the crucial test in determining a constructive delivery". *Snidow* v. *First National Bank, supra*, at 245, 16 S. E. 2d at 387. However, we have said many times that in order for there to be constructive delivery, the donor's intention must be *in praesanti*, and the constructive delivery such as to divest the owner of all dominion and control over the property and invest it in the donee. *Copenhaver* v. *Halsey*, 211 Va. 390, 177 S. E. 2d 634 (1970); *Rust* v. *Phillips, supra*; *Taylor, Adm'x* v. *Smith*, 199 Va. 871, 102 S. E. 2d 160 (1958); *Payne* v. *Tobacco Trading Corp., supra*. The authorities universally hold that in order to constitute a valid gift, the deed must pass beyond the dominion and control of the donor and come within the power and control of the donee.

"The principles relating to the delivery of personal property by way of a gift, either *inter vivos* or *causa mortis*, and delivery of a deed

for real estate are much the same. . . ." *Snidow* v. *First National Bank, supra,* at 245, 16 S. E. 2d at 387. Our most recent expression on the delivery necessary to constitute a completed gift is found in *Rust* v. *Phillips, supra.* In June, 1963, Daniel Rust wrote letters to each of his six children stating his intention to give each one of them at Christmastime certain negotiable notes he owned. Enclosed with each letter were the notes designated for the addressee child. Each letter, together with the notes, was placed in a sealed envelope, handed to Elizabeth Phillips, his secretary and daughter, and she was told to place the letters in his lockbox to be mailed at a later date. Rust died in October, 1963, before the letters were ever mailed or otherwise delivered. The decedent's intention to make the gifts was established beyond question, but Chief Justice, then Justice, Snead, reviewed for the court the applicable Virginia case law and concluded that "the essential element of delivery is lacking", holding that Mrs. Phillips acted as her father's agent and that since she was never told to mail or deliver the envelopes this indicated that Rust was not ready to relinquish all dominion and control over the property and vest it in his children.

After his two consultations with Gibson in June and August, 1970 Capozzella obviously lost interest in making a gift of the land to Harriet. He therefore did not write or contact Gibson or pursue the matter further with his attorney. With his marriage disintegrating, and friction developing, it can be said here, as the Chief Justice said in *Rust,* Capozzella was not ready to "relinquish all dominion and control" over his property. He therefore declined to authorize delivery by his attorney.

I would reverse.